[No. D024120. Fourth Dist., Div. One. Nov. 20, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
NIKI LYNN MARTINEZ, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*This opinion is ordered certified for publication with the exception of parts IC, ID, II and III.

## Counsel

Martin Nebrida Buchanan, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Keith I. Motley and Douglas P. Danzig, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

KREMER, P. J.—Niki Lynn Martinez appeals her convictions of murder (Pen. Code,[1] § 187, subd. (a)) and attempted murder (§§ 187, subd. (a), 664) and findings the murder was committed in the attempted commission of a robbery (§ 190.2, subd. (a)(17)); she inflicted great bodily injury in the commission of the attempted murder (§ 12022.7, subd. (a)); she personally used a firearm in both crimes (§ 12022.5, subd. (a)); and inflicted great bodily injury or death by discharging a firearm from a motor vehicle (§ 12022.55) in both crimes.

On appeal, Martinez contends the court erred in admitting her statement to the police that she had shot at people, erred in refusing a limiting instruction regarding the statement and erred in finding she was ineligible for a California Youth Authority commitment. She also contends her counsel was incompetent in failing to object to the presentation of certain rebuttal witnesses. We affirm.

### FACTS

On May 1, 1994, Martinez arranged to get a ride home from her job with James Cusick. Martinez had known Cusick for about three months; he wanted her to be his girlfriend but she had said "no." When Cusick picked her up after work in a truck, there was a man in the back seat whom Martinez did not know. Instead of driving home, the three cruised around Hillcrest, stopped at an apartment in North Park where Cusick went in for about five minutes and then stopped at a 7-Eleven because Martinez wanted some cigarettes. Cusick placed a .380-caliber handgun on Martinez's lap while he went into the store. She was not shocked by the gun; she knew Cusick had guns, including a 12-gauge shotgun.

Eventually, they drove to Balboa Park. While driving in Balboa Park, Cusick talked about robbing someone because he needed money. They drove up and down the Laurel Street bridge in to Balboa Park several times and selected a young couple, John Lentz and Dhyana Burtnett. Cusick stopped the truck by the couple, who were embracing, and said to Martinez, "Get

---

[1]All statutory references are to the Penal Code unless otherwise specified.

'em." Martinez, holding the handgun, put her hand out the window and rapidly fired five shots at the couple. Cusick then sped away and drove Martinez home. Four bullets hit Lentz. He died from his wounds. Martinez shot Burtnett in her arm.

The police arrested Martinez on May 12, 1994. They searched her house and seized, among other items, letters and a "weekly minder" book. In a letter to a friend, Martinez wrote she had done "some heavy dirt," i.e., "something bad" and if the police found out she would be writing from custody. She stated "I'm carrying a 12-gauge [shotgun] everywhere I go with me." This shotgun belonged to Cusick. She also stated she was not "tripping" (i.e., worried) because the police were looking for someone who did not match her description. In her weekly minder book, she wrote on May 1, 1994: "Caps get peeled" which means "shots get fired."

The police interviewed Martinez on the day she was arrested. During the interview, Martinez admitted shooting at Lentz and Burtnett. When asked what she thought Cusick meant when he said "get 'em," Martinez answered, "Either he wanted me to get out and just get them or just shoot them," "[h]e wanted me to get out and get their stuff," "[h]e just wanted me to take their money and their jackets or whatever" because Cusick did not have any money.

During the interview, the police several times asked Martinez why she shot Lentz and Burtnett. She answered, Cusick told her to shoot them when he said "get 'em." She said, "I don't know why I did that. I just did it"; that it was "just a last minute decision." She explained, "I was going to get out and get them for what they had, but the car was coming up behind me and I just shot them. I was nervous. I didn't know what to do, so I just shot them." She said, "the only reason why I shot is because they both seen me with my hand out the window before I shot the gun and then we seen a car coming up behind me." She repeated this explanation: "[M]y intention was not to shoot anybody. And when we got in front of them, I mean, I had my hand out the window and it's like, you know, I mean, I didn't, I didn't know what to do. I didn't know what to do because they had seen me with the gun in my hand and there was a car coming behind us."

During the interview, Martinez did not mention seeing a shotgun in the truck nor did she say she shot Lentz and Burtnett because she was afraid of Cusick. Martinez stated she was responsible for the shooting, stating "I'm, I'm the one who did it." "I mean I did it because [Cusick] said it, but, you know, I mean, just because he said it don't mean nothing. I, I'm the one who did it, so . . . ."

During the interview, the police asked Martinez about whether she had previously shot at people:

"[Detective]: Have you ever done it before?

"[Martinez]: Yes.

"[Detective]: Where?

"[Martinez]: Chicago.

"[Detective]: How many people did you shoot there?

"[Martinez]: I never shot nobody. I shot at people.

". . . . . . . . . . . . . . . . . . . . . . . . . .

"[Martinez]: I didn't know what to do, so I just shot them.

"[Detective]: But you shot at people before?

"[Martinez]: Yeah."

At trial, Martinez testified she shot Lentz and Burtnett because she was afraid of Cusick. She testified within three weeks of giving Cusick her phone number in February 1994, she regretted it because he constantly called her and wanted her to be his girlfriend. He showed her a 12-gauge shotgun with about a dozen notches on it which he claimed represented the number of people that had been shot with the gun. She stopped returning his calls and tried to avoid him.

One morning she found a 12-gauge shotgun shell with a note written by Cusick pointing to the shell and stating "187," i.e., the Penal Code section for murder. He told her he left the shell and note because she had been avoiding him and that she "was lucky that he didn't blow up [her] house and [her] mom and [her] car because [she] wasn't returning his calls." He laughed and Martinez laughed in response but she was afraid of him because she "knew he was able and capable of doing something like that." She presented witnesses who had seen the shotgun shell and note. Later she put the shotgun shell on a key ring because, she said, Cusick told her to.

On direct examination, Martinez testified to the same events preceding the shooting as she told the police. She stated when Cusick stopped the truck on the bridge, "he started screaming, 'Get em, get 'em,' and hit me in my arm.

And I turned and looked at him. And I looked down and I seen the 12-gauge, and I turned around and I just started shooting. . . . Because I was scared. I didn't know what he wanted me to do."

On cross-examination, she admitted when Cusick said, "get 'em," she "didn't know if he wanted [her] to jump out of the truck or to shoot at them."

On redirect, for the first time, she stated Cusick had put her name on a shotgun shell and that she was afraid for her life when she saw Cusick sitting in the truck with the shotgun. On re-cross-examination, when asked if she thought Cusick was going to kill her, Martinez answered, "I don't know. He could have."

In rebuttal, the prosecution presented a witness who had talked to Martinez shortly after the killing. He testified Martinez admitted being involved in the Balboa Park shooting. Martinez said "she blasted someone," that she did not know why she did it. Martinez said, "I don't know. I was just mad. And I was—I was just cruisin' doing something, just hanging out" and that she was going to "jack" him. Martinez explained, when she saw the car coming, she was getting out of the truck and "she just blasted" the victim.

DISCUSSION

I

*Admission of Statement Martinez Had Previously Shot at People*

A. *Prior Inconsistent Statement*

■ Martinez contends her statement to the police she had "shot at people" did not constitute proper impeachment because the statement was not inconsistent with her trial testimony.

During her direct examination, Martinez testified:

"Q. As you sit here today, Niki, if you had this to do over again, would you shoot Mr. Cusick, or would you shoot out of the car?

"A. *I wouldn't shoot anybody.* But if I had to, it would be Mr. Cusick.

"Q. And why would you shoot Mr. Cusick, Niki?

"A. Because of the type of person that he was.

"Q. Were you afraid of Mr. Cusick?

"A. Yes." (Italics added.)

During cross-examination, the prosecutor asked her about her statement to the police that she had shot at people:

"[Prosecutor]: You've shot at other people before, haven't you?

"[Martinez]: No, I haven't.

"[Prosecutor]: In your interview with the detectives, you told the detectives you had shot at people before, though, didn't you?

"[Martinez]: Yes."

On redirect examination, Martinez testified she had told the police she had shot a gun before because she had done so but stated it was not true that she had shot at people.

Martinez contends her statement to the police that she had "shot at people" was not inconsistent with her trial testimony because at trial "she was obviously only responding to defense counsel's question about whether she would shoot Cusick or shoot out of the car in Balboa Park if she had it all to do over again." This is but one interpretation of her statement at trial. Alternatively, depending on her demeanor and her tone, her statement could be interpreted as a general denial that she would shoot at anyone, rather than a statement narrowly limited to Lentz, Burtnett or Cusick. The trial court heard Martinez's testimony, saw her demeanor and rejected her argument her trial statement was as limited as she asserts. We defer to the trial court's assessment and conclude Martinez's prior statement to the police was admissible as a prior inconsistent statement.

### B. *Corpus Delicti Rule*

 Martinez contends admission of her prior statement violated the corpus delicti rule as there is no evidence aside from her statement of any prior shooting.

 "The corpus delicti rule requires that the corpus delicti of a crime be proved independently from an accused's extrajudicial admissions. [Citations.]" (*People* v. *Jennings* (1991) 53 Cal.3d 334, 364 [279 Cal.Rptr. 780, 807 P.2d 1009].) " ' "The corpus delicti of a crime consists of two elements, the fact of the injury or loss or harm, and the existence of a criminal agency as its cause." ' " (*People* v. *Zapien* (1993) 4 Cal.4th 929, 985-986 [17

Cal.Rptr.2d 122, 846 P.2d 704].) Failure to enter a corpus delicti objection at trial waives the issue on appeal. (*People* v. *Wright* (1990) 52 Cal.3d 367, 404 [276 Cal.Rptr. 731, 802 P.2d 221].)

The Attorney General argues Martinez waived any corpus delicti problem by failing to object on that basis. Martinez contends defense counsel entered a corpus delicti objection when he argued for exclusion of the statement on the basis "a statement regarding shooting a gun is not actually evidence of a prior bad act, but it is a statement regarding a prior bad act, not a bad act itself" and "there is no showing . . . there was a prior bad act with respect to having shot at people before." Assuming this objection was sufficient to preserve the issue for appeal, nonetheless we find no basis for reversal.

To support her argument that the People must prove the corpus delicti of a defendant's uncharged bad acts independently of the defendant's admission, Martinez relies on *People* v. *Robertson* (1982) 33 Cal.3d 21 [188 Cal.Rptr. 77, 655 P.2d 279]. In *Robertson*, the court admitted defendant's statements during a rape that he had killed two other women. The defendant asserted his trial counsel was ineffective in failing to enter a corpus delicti objection, i.e., in failing to object to the admission of the statement on the ground the prosecutor failed to introduce independent evidence the two prior murders occurred. In response to the defendant's argument, the Supreme Court stated: "California has long adhered to the rule, established at common law and followed in most jurisdictions, that 'evidence of the commission of a prior crime may not be proved by the introduction of evidence of an extrajudicial admission without proof *aliunde* that such a crime had been committed.' [Citations.]" (*People* v. *Robertson, supra*, 33 Cal.3d 21, 41.)

The Supreme Court in *Robertson*, however, did not apply this "long adhered to rule" in the case; the *Robertson* court, after setting out the rule, proceeded to decide the case on the basis the trial court should have excluded the prior bad act evidence on the basis the prejudicial effect outweighed its probative value. (*People* v. *Robertson, supra*, 33 Cal.3d 21, 42.)

The *Robertson* case was analyzed in *People* v. *Denis* (1990) 224 Cal.App.3d 563 [273 Cal.Rptr. 724]. In *Denis*, the appellant contended his counsel was incompetent for failing to enter a corpus delicti objection to his admission of his statement to the police that he had participated in several other robberies. The statement was admitted to establish the appellant's state

of mind. The *Denis* court noted the Supreme Court in six opinions,[2] including the *Robertson* case had declared the commission of a prior crime may not be proved by evidence of a defendant's extrajudicial admission without independent proof the crime had been committed, however, upon "[a] close reading of those [cases]" the *Denis* court found that three of the decisions (*Nye, Hines* and *Hamilton*) involved the separate matter of proving prior crimes in a penalty phase and the remaining three decisions (*Quicke, Robertson* and *Williams*)[3] merely proclaimed the rule but did not apply it. (*People* v. *Denis, supra,* 224 Cal.App.3d 563, 568-569.)

The *Denis* court also found the *Robertson* court's reliance on "common law" and "most jurisdictions" for the rule appeared unsupported, was unable to find any mention of this supposedly "long adhered to" rule in any of the authorities on the subject and noted some of the authorities had questioned the need for the corpus delicti rule itself. (*People* v. *Denis, supra,* 224 Cal.App.3d 563, 569-570.) The *Denis* court concluded the corpus delicti rule did not apply to "uncharged conduct, offered for a limited purpose under Evidence Code section 1101, subdivision (b)." (*People* v. *Denis, supra,* 224 Cal.App.3d 563, 570.)

The California Supreme Court, in its most recent statement on this issue has questioned whether the corpus delicti rule applies to uncharged prior bad acts. The Supreme Court, citing the *Denis* case stated: "It is not clear that the corpus delicti rule applies to other crimes evidence offered solely to prove facts such as motive, opportunity, intent, or identity, or for impeachment." (*People* v. *Clark* (1992) 3 Cal.4th 41, 124 [10 Cal.Rptr.2d 554, 833 P.2d 561].) In *Clark,* the Supreme Court declined to "decide the point, for the corpus delicti was established in this case independently of defendant's extrajudicial writing." (*Ibid.*)

In sum, Martinez's argument relies on dicta; the corpus delicti rule has never been applied to other-crimes evidence introduced for impeachment purposes in the guilt phase of a trial.

Moreover, it is reasonable that the corpus delicti rule not apply to the statement here. Martinez's statement was introduced as a prior inconsistent

---

[2] These six opinions are: *People* v. *Williams* (1988) 44 Cal.3d 883, 910-911 [245 Cal.Rptr. 336, 751 P.2d 395]; *People* v. *Robertson, supra,* 33 Cal.3d 21, 41; *People* v. *Nye* (1969) 71 Cal.2d 356, 367 [78 Cal.Rptr. 467, 455 P.2d 395]; *People* v. *Quicke* (1969) 71 Cal.2d 502, 520 [78 Cal.Rptr. 683, 455 P.2d 787]; *People* v. *Hines* (1964) 61 Cal.2d 164, 174 [37 Cal.Rptr. 622, 390 P.2d 398]; and *People* v. *Hamilton* (1963) 60 Cal.2d 105, 129 [32 Cal.Rptr. 4, 383 P.2d 412].

[3] In *Quicke,* the court ruled the corpus delicti rule applied to past offenses introduced at the penalty phase. In *Robertson,* the court ruled on the basis that admission of the statement was more prejudicial than probative. (*People* v. *Robertson, supra,* 33 Cal.3d 21, 42.) In *Williams,* the court held the corpus delicti rule was satisfied by independent evidence of the uncharged crimes. (*People* v. *Williams, supra,* 44 Cal.3d 883, 910.)

statement to impeach her trial testimony that she "wouldn't shoot anybody." An inconsistency between two statements tends to impeach the witness's credibility because it tends to show the witness is a liar, either on the previous occasion or at trial. (See Evid. Code, § 780, subd. (g).) There is no requirement that the proponent of a prior inconsistent statement prove the truth of the prior statement since it is inconsistency itself which makes the prior statement relevant and admissible evidence.

No reversal is merited on the ground the corpus deliciti of Martinez's prior shooting was not established by other evidence before her statement was admitted.

C., D., II, III*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is affirmed.

Work, J., and McIntyre, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 12, 1997.

*See footnote, *ante*, page 537.