[No. C051803. Third Dist. Nov. 20, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL AARON DAVIS, Defendant and Appellant.

[No. C051963. Third Dist. Nov. 20, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
JAVIER MUNOZ, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to rule 8.1110 of the California Rules of Court, this opinion is certified for publication except for parts I., II., III.B., III.D., III.E., and IV. through VII.

618

## COUNSEL

Christine Vento, under appointment by the Court of Appeal, for Defendant and Appellant Michael Aaron Davis.

Janet J. Gray, under appointment by the Court of Appeal, for Defendant and Appellant Javier Munoz.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Robert Gezi, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MORRISON, J.**—Defendant Javier Munoz made and received several calls on his mobile telephone before and after he and several other men, including defendant Michael Aaron Davis, Preston Baldwin and John Hernandez, drove to the Meadowview light rail station in two SUV's to retaliate against "some brothers" who had "jumped" Hernandez's nephews. Instead, the men trapped a car driven by Demario Chappell, who had nothing to do with "jumping" Hernandez's nephews, and fired pistols at the car. Although a number of nine-millimeter and .45-caliber shots were fired, only one bullet struck Chappell. The bullet lodged in Chappell's brain, but miraculously did not kill him.

Defendants were no doubt dismayed to learn that a federal judge had previously authorized the Drug Enforcement Agency (DEA) to wiretap Munoz's mobile telephone. This must have been a welcome surprise to the lead detective, when a DEA agent told him about the recordings.

Hernandez remains a fugitive. Baldwin pleaded no contest to two counts of assault with a firearm, with a vicarious arming enhancement, for a stipulated

term of nine years four months, and he did not appeal. (Pen. Code, §§ 245, subd. (b), 12022, subd. (a)(1).) Davis and Munoz were jointly tried before separate juries, which convicted them of attempted murder and found each used, discharged, and proximately caused great bodily injury with, a firearm; Munoz's jury also convicted him of conspiracy to murder, but Davis's jury deadlocked on that count and it was dismissed. (*Id.*, §§ 664, 187, 12022.53, subds. (b)–(d), 182.)

Both Davis and Munoz were sentenced to prison and both timely filed their appeals, which we consolidated for decision. Defendants each raise many issues on appeal and each incorporates the other's briefs. The People agree that Davis is entitled to additional custody credits, and identify an error in Munoz's abstract of judgment. Apart from these two points, we affirm the judgments.

■ In the published portions of this opinion, we conclude: (1) Wiretap evidence is subject to the normal rule that a party seeking exclusion must object or move to suppress in the trial court, or claims of inadmissibility will be deemed forfeited on appeal. (2) The corpus delicti rule does not apply to uncharged acts, except when uncharged acts are used in the penalty phase of a capital trial.

## FACTS

The DEA began monitoring Munoz's calls on June 24, 2004. (Further unspecified dates are in 2004.) The DEA's recording system captures conversations on the caller's end even before the recipient answers.

Some recordings were introduced into evidence to show the relationships of the parties, their access to weapons and their intent. For example, on June 30, Munoz called Davis and said he was taking a "Glock" to "John" (Hernandez). Davis replied that Munoz should take him the "four-five" (i.e., a .45-caliber pistol) because Davis wanted the Glock back. Munoz said he was referring to *his* Glock, but Davis said Munoz should still give Hernandez the "four-five," so Hernandez could "blow holes." Munoz explained that he preferred to give Hernandez the Glock because the "four-five" was "fresh" and "clean."

On July 1, at 9:22 p.m., Hernandez called Munoz, and said, "My nig, you got the [clapper (gun)] on you?" "[S]ome brothers" "just jumped my nephews" at the Meadowview light rail station; Munoz replied, "I'm coming right now." At 9:29, Munoz called to tell Hernandez, "I'm behind you, I'm, I'm turning right right here on Meadowview."

Chappell drove to the Meadowview station in his white Chevrolet Corsica with his cousin Marquis Landers as a passenger, in order to pick up Arielle Jones, Landers's friend. She got in the backseat and Chappell started to drive her home. It was about 9:30.

Although the various witness accounts were not entirely consistent, a white or silver SUV cut Chappell off, requiring him to brake hard, and inducing him to make an unfriendly comment to the SUV's driver. Munoz's green SUV trapped Chappell's car. A number of men got out of the SUV's, and when Chappell saw a man pointing a gun at him, he drove off, hitting the second SUV in his effort to get away. After he blacked out he stopped the car and then Jones drove him to the hospital. Landers testified one shooter got out of each SUV, but later he testified he did not know this, and he had so told an officer before trial.

Two passersby heard someone in the green SUV yell "Bitch, ass, Niga" as it left; one heard laughter and described this yell as "Celebrating, sort of."

Many shots had been fired at Chappell's car; four nine-millimeter and seven .45-caliber shell casings were found. Two nine-millimeter bullets were found in the car, and a .45-caliber bullet was extracted from Chappell's brain.

At 9:33, Hernandez called Munoz, and said, "Think they got my license plate?" He told Munoz, "Put your shit in the garage, I'm putting mine away right now, too."

At 9:49, Munoz spoke with someone and said he could not drive his "truck," and "we just lit some niggers up, bro. I think I murffed [phonetic] one of 'em. I need somebody to go by there, bro."

At 9:56, Munoz called Davis, in part as follows:

"[Munoz:] Where you at?

"[Davis:] Right here. There ain't even nothing up there!

"[Munoz:] So we didn't even shoot 'em then, nigga.

"[Davis:] Ah, hell no, nigga! The [unintelligible] up there though.

"[Munoz:] Some boys [i.e., police] are out there?

"[Davis:] Yeah, just a couple o' cars though.

"[Munoz:] We . . . so then we didn't kill his ass?

"[Davis:] Naw, we didn't kill 'im, man.

"[Munoz, in a disappointed tone of voice:] Fuck! Now we really gotta watch out."

At 9:57, Munoz called Hernandez, but before Hernandez answered on his end, Munoz can be heard on the recording telling someone ". . . seen me shoot like this, 'Pop! Pop!' Then I said, 'Fuck that!' 'Pop! Pop! Pop! Pop! Pop!' That's why . . . ." After Hernandez answered, Munoz told him "Lil' Smokes," meaning Davis, was at the scene, there were some police there and it seemed like nobody got hit; Hernandez said "they probably drove to the hospital." Munoz said "Pop!" seven times and there were seven .45-caliber casings found.

At 10:14, Munoz called someone and in part said, "We just have to show these niggas that we ain't playing," that they had had trouble with "some Blacks" "because of [Hernandez's] nephews" and they "almost killed the dudes."

At 10:47, Munoz talked to someone about the need to fix a dent in his SUV "ASAP," a dent presumably caused when Chappell drove away, hitting one of the SUV's while attempting to escape.

In a call on July 2, Davis told Munoz he should switch "clappers," and Munoz suggested that Davis give him the "forty" (i.e., .40-caliber pistol) and take the "Neener" (nine-millimeter pistol); Davis said, "I don't want them guns around me." They talked about what the police might know.

In Munoz's apartment police found a silver-and-black .45-caliber Ruger pistol, a black nine-millimeter Glock pistol, and ammunition fitting both. A criminalist testified these guns fired the bullets that left the shell casings at the scene, and fired the bullet found in Chappell's brain.

On July 21, Davis was found hiding under a house in which a safe contained a .40-caliber Glock pistol, as well as a nine-millimeter bullet; another nine-millimeter bullet was found on a nightstand in the master bedroom: Davis refused to surrender until he was extracted with the help of a canine officer.

Munoz's jury heard evidence of statements he made, while in custody, to Detective MacLafferty on July 7. Munoz first claimed that Davis had borrowed his SUV after Hernandez called to say his nephew Bradley had

been jumped; when Davis returned, he said he had been in a shootout. Munoz said that the guns found in his house were not connected to the shooting and his gun was at his father's house. Munoz then admitted that he knew Hernandez was going to the station to "fuck some kids up," and that Davis was armed, and that with that knowledge Munoz drove his green Tahoe, with Davis, Baldwin and "Dion," and met Hernandez and others; Dion gave one man a gun. After a white car cut them off at the station, Davis and Dion shot at it. Munoz denied using a gun or expecting that the men would do anything other than beat someone up.

Munoz's jury also heard some wiretap calls unrelated to Davis, including two calls within minutes of each other on June 26. In the first call, at 1:21 p.m., Hernandez directs Munoz to bring him a gun so he could shoot a rival named "Rabby," Munoz accepts the assignment. The men were discussing where to meet during the conversation. In the second call, at 1:27, between Munoz and an unidentified person, Munoz says he "caught 'em" and "was about to let 'em have it, nigga, but the boys was right there!" and later says "When John [i.e., Hernandez] runs up on 'im, he pulls a fucking strap out! He almost shot John!"

In a call on June 29, Munoz told Hernandez about shooting at someone from inside his "truck," so the shell casings would not be left; he thought this incident was "hella funny." Also on June 29, a man called Munoz and described beating "Gabino" over a debt; Munoz said he had "hammers" (guns) and would "come 'round the corner lammin'."

Munoz did not testify, but in argument pressed the theory that he was not one of the shooters.

Davis's jury heard testimony from Munoz's wife about Munoz's drug dealing and the fact both he and Davis were usually armed. Davis's jury also heard about a statement Davis made to the police in which, after initially denying involvement, he admitted he shot at the car with a nine-millimeter Glock pistol.

Davis claimed self-defense: He testified he went with the other men with no purpose to harm anyone, but when the shooting started he feared for his life. In large part this was due to his traumatic experience of having been shot in 2003, and much evidence about that event was presented. He admitted he was a drug dealer and carried a gun because he had a lot of money; he also admitted he carried it generally because he sometimes had drugs and drug dealers could be robbed.

In light of a pretrial ruling, Davis admitted that he threatened B.A.'s sons while displaying a gun to her; the jury was instructed on the limited use of this misdemeanor moral turpitude evidence.

DISCUSSION

.I., II.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

III. Challenges to Wiretap Evidence

Defendants challenge the wiretap evidence on many grounds, some of which are based on wiretap law and some of which are based on other principles. For clarity, we first summarize all of our conclusions touching on the wiretap evidence.

(A) We find defendants forfeited their claims that the wiretap evidence should not have been admitted (1) absent a judicial finding of lawfulness, and (2) because the record lacks evidence that the recordings were properly sealed. We reject their fallback claims that their trial attorneys were incompetent because they failed to preserve these claims.

(B) We reject on the merits the claim that the affidavit failed to show the "necessity" required for a wiretap order.

(C) We reject the claim that the corpus delicti rule applies to evidence of uncharged acts in the recordings.

(D) We reject the claims that specific uncharged acts as to each defendant should have been excluded as improper character evidence or as more prejudicial than probative.

(E) We reject the claims that the trial court had a duty to give a limiting instruction on the uncharged acts, and the fallback claims that the trial attorneys were incompetent because they did not ask for such an instruction.

A. Forfeited claims

The collection and use of wiretap evidence is regulated by federal law (18 U.S.C.A. § 2510 et seq.; Title III), and analogous California law (Pen. Code, § 629.50 et seq.).

Munoz moved to suppress the wiretap recordings based on lack of full discovery of the wiretap affidavit and lack of necessity for the wiretap order. Davis's trial brief joined in these objections. The prosecutor's response in

*See footnote, *ante*, page 617.

part referenced an order by Judge Ransom, sanitizing the material and sealing the affidavit. The prosecutor had requested this order ex parte, explaining that "The charges in this complaint are not targeted offenses of the federal interception order." The United States Attorney's Office had asked the prosecutor to seek this order pursuant to Penal Code section 629.70, subdivision (d), providing for good-cause limits on disclosure. After the trial court ordered full disclosure of the affidavit, defendants renewed their motion to suppress, based on *and only on* the claim that the affidavit did not show necessity. Later, Munoz moved to suppress specific calls, and Davis purported to join as to calls relevant to him, but that motion was not based on wiretap law.

The trial court denied the motion to suppress, stating: "I did read the entire 74-page affidavit, and the order as well, and frankly I'm very impressed with the affidavit. I thought it was very, very thorough, well-supported. I think the finding of requisite necessity . . . is well-supported and I think the wiretap complies in all respects to the federal law."

When authorities listen for conversations about the crime(s) specified in a wiretap order, it is not unusual for them to hear conversations about other crimes. To use those recordings, the government must seek court permission: "When an investigative or law enforcement officer . . . intercepts . . . communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof, and evidence derived therefrom, may be disclosed or used as provided in subsections (1) and (2) of this section [relating to investigations and performance of official duties]. Such contents and any evidence derived therefrom may be used under subsection (3) of this section [that is, testimony in any proceeding] when authorized or approved by a judge of competent jurisdiction where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter. Such application shall be made as soon as practicable." (18 U.S.C.A. § 2517(5); see Pen. Code, § 629.82, subd. (a) [analogous Cal. statute].)

The offenses described in United States District Court Judge Burrell's order authorizing the wiretap relate to the manufacturing, importation and distribution of narcotics, money laundering and related offenses. Although the trial court made a general finding that the wiretap complied "in all respects" to federal law, it does not appear that the People's ex parte sealing and sanitization application was a "subsequent application" as contemplated by this statute and therefore for the purposes of argument we do not construe the trial court's general statement to mean that it found compliance with this provision, as it was not asked to make this finding.

Federal law also requires that "Immediately upon the expiration of the period of the order . . . such recordings shall be made available to the judge issuing such order and sealed under his directions." (18 U.S.C.A. § 2518(8)(a); see Pen. Code, § 629.64 [analogous Cal. statute].) The record does not show when or how Judge Burrell sealed the recordings.

On appeal, defendants contend that these gaps in the record compel reversal. Both of these claims are forfeited as they were not lodged in the trial court.

As a general rule a party objecting to evidence must make a timely and specific objection *in the trial court.* (Evid. Code, § 353, subd. (a); see *People v. Smith* (2007) 40 Cal.4th 483, 519–520 [54 Cal.Rptr.3d 245, 150 P.3d 1224].) This gives both parties the opportunity to address the admissibility of the evidence so the trial court can make an informed ruling, and creates a record for appellate review. (See 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 394, pp. 444–445 ["it is *unfair to the trial judge and to the adverse party* to take advantage of an error on appeal when it could easily have been corrected at the trial"].)

In some suppression contexts the burden is on the People to prove that evidence was lawfully obtained, for example, during a warrantless search, but this burden arises when and only when a defendant moves to suppress and makes a prima facie claim that the search or arrest was without a warrant. (*People v. Williams* (1999) 20 Cal.4th 119, 128–130 [83 Cal.Rptr.2d 275, 973 P.2d 52]; see *People v. Manning* (1973) 33 Cal.App.3d 586, 600 [109 Cal.Rptr. 531] ["the burden is clearly upon the defendant, as moving party, to raise the issue of illegally obtained evidence"]; see also Cal. Criminal Law: Procedure and Practice (Cont.Ed.Bar 2007) Search and Seizure Motions, § 16:18, p. 438.)

Defendants claim the proponent of *wiretap evidence* must show it is admissible and the trial court judge has the duty to review the adequacy of sealing and the propriety of introduction of recordings about crimes other than those specified in the affidavit, and that they had no obligation to move to suppress or object on these grounds. We disagree.

For example, defendants assert the lack of a timely subsequent application to allow the use of recordings not related to narcotics. How is this alleged failure qualitatively different from the failure to comply with the knock-notice rule, the business records exception, the *Miranda* warnings (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]), or the many other constitutional, statutory and judge-made rules that may, *if timely invoked,* result in the exclusion of evidence?

In these and many other examples, the proponent must be prepared to defend the propriety of the evidence, but in the absence of an objection, the evidence will be admitted. It has long been held that inadmissible evidence may support a criminal conviction where no objection has been interposed (*People v. Grayson* (1959) 172 Cal.App.2d 372, 377–378 [341 P.2d 820]), even unlawfully obtained evidence (*People v. De Santiago* (1969) 71 Cal.2d 18, 22 [76 Cal.Rptr. 809, 453 P.2d 353] [exception where law changed]; *People v. Rogers* (1978) 21 Cal.3d 542, 547–548 [146 Cal.Rptr. 732, 579 P.2d 1048] ["The contrary rule would deprive the People of the opportunity to cure the defect at trial and would 'permit the defendant to gamble on an acquittal . . . .' "]).

In a case where an officer testified about the contents of telephone conversations he listened to, the defendants alleged this violated state and federal statutes which would have required exclusion unless one party to the conversation allowed the officer to listen in. The California Supreme Court held: "There is no evidence as to whether Hall did or did not know of or consent to [the officer's] listening to the conversations, and defendants at the trial did not object to the admission of the evidence on the ground of their present contention. *Therefore, the merits of the contention were not before the trial court and are not before this court.*" (*People v. Rojas* (1961) 55 Cal.2d 252, 260 [10 Cal.Rptr. 465, 358 P.2d 921], italics added.) Although *Rojas* did not involve the statutes relied on by defendants in this appeal, we see no reason not to apply the general rule requiring a trial court objection.

Although defendants call it an "untenable premise" to treat wiretap evidence like other evidence, they do not persuasively explain why that premise is untenable. They quote from *United States v. Marion* (2d Cir. 1976) 535 F.2d 697, which stated that, in order to guard against "Orwellian fears," "Title III imposes detailed and specific restrictions upon both the interception of wire and oral communications, and the subsequent use of the fruits of such interceptions, in an effort to ensure careful judicial scrutiny throughout." (*Id.* at p. 698.) But Marion moved to dismiss the indictment because the government had not applied for authorization to use the intercepted calls before presenting them to the grand jury. (*Id.* at pp. 699–700.) Thus, the quoted generality does not support the proposition that the trial court had a duty *on its own motion* to review the legality of the wiretap evidence. Defendants have not cited any cases holding that wiretap evidence is immune from the normal requirement that an appropriate motion or objection must be made in the trial court.

■ Federal and state wiretap laws both provide for motions to suppress. (18 U.S.C.A. § 2518(10) [procedures for motion to suppress for unlawful wiretap, defective wiretap order, or monitoring in violation of valid wiretap

order]; Pen. Code, § 629.72 [analogous Cal. statute].) The California statute provides that a motion to suppress wiretap evidence "shall be made, determined, and be subject to review in accordance with the procedures set forth in Section 1538.5." (Pen. Code, § 629.72.) In turn, Penal Code section 1538.5, subdivision (m) provides: "The proceedings provided for in this section . . . shall constitute the sole and exclusive remedies prior to conviction to test the unreasonableness of a search or seizure where the person making the motion for the return of property or the suppression of evidence is a defendant in a criminal case and the property or thing has been offered or will be offered as evidence against him or her. A defendant may seek further review of the validity of a search or seizure on appeal from a conviction in a criminal case notwithstanding the fact that the judgment of conviction is predicated upon a plea of guilty. *Review on appeal may be obtained by the defendant provided that at some stage of the proceedings prior to conviction he or she has moved for the return of property or the suppression of the evidence.*" (Italics added.)

█ Thus, review of a suppression issue may be obtained if and only if at some point before conviction the defendant raised the issue. (*People v. Gutierrez* (2004) 124 Cal.App.4th 1481, 1484–1485 [21 Cal.Rptr.3d 926]; *People v. Pranke* (1970) 12 Cal.App.3d 935, 941–942 [91 Cal.Rptr. 129]; 4 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Illegally Obtained Evidence, § 381, pp. 1069–1070.) Penal Code section 1538.5 does not treat wiretap evidence differently from other evidence potentially subject to exclusion.

Federal courts have held that the failure to make an appropriate motion forfeits a claim that wiretap evidence should have been excluded. (*United States v. Morgan* (9th Cir. 1979) 595 F.2d 1168, 1170; *United States v. Scavo* (8th Cir. 1979) 593 F.2d 837, 844 [failure to timely move to suppress on ground conversations were for other crimes than those stated in wiretap order]; *United States v. Rabstein* (5th Cir. 1977) 554 F.2d 190, 193–194; *United States v. Johnson* (D.C. Cir. 1976) 176 U.S. App.D.C. 179 [539 F.2d 181, 189–190] [construing "essentially identical" D.C. statute]; *United States v. Daly* (8th Cir. 1976) 535 F.2d 434, 440; see *U.S. v. Torres* (9th Cir. 1990) 908 F.2d 1417, 1424; *United States v. Moon* (5th Cir. 1974) 491 F.2d 1047, 1049–1050 [trial court should not have considered untimely motion].)

It is true that federal law broadly provides: "Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other

authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter." (18 U.S.C.A. § 2515.)

But suppression is mandated " 'where there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device.' " (*U.S. v. Duran* (9th Cir. 1999) 189 F.3d 1071, 1085, quoting *United States v. Giordano* (1974) 416 U.S. 505, 527 [40 L.Ed.2d 341, 360, 94 S.Ct. 1820].) Whether there has been such a failure must be adjudicated upon timely objection, as with other claims that evidence should be excluded. "A defendant bears the burden of proving that a wiretap is invalid once it has been authorized." (*U.S. v. Ramirez-Encarnacion* (10th Cir. 2002) 291 F.3d 1219, 1222.) As stated, many cases hold that the failure to bring a timely challenge to wiretap evidence forfeits the claim. We reject the argument that a trial court must evaluate wiretap evidence on its own motion.

*People v. Jackson* (2005) 129 Cal.App.4th 129 [28 Cal.Rptr.3d 136] (*Jackson*), relied on by defendants, states that the prosecutor moved for authorization to use recordings about other crimes. But *Jackson* does not state or imply that a defendant need not lodge an objection on the ground no such authorization was obtained. A case is not authority for propositions not considered. (*Hart v. Burnett* (1860) 15 Cal. 530, 598.)

Defendants complain that the record does not show compliance with these statutes, but that militates against them: Had they lodged timely objections, the People could have produced the evidence necessary to show, for example, that the proper sealing procedures had been used, or that a judge had authorized the use of the recordings in this case. Their claim that they cannot know whether recordings are properly sealed and therefore should not be charged with the duty to object is unpersuasive: Had defendants claimed in their motion that the recordings were not properly sealed, the record could have been developed, factually, as to what sealing was done. (See *United States v. Orozco* (S.D.Cal. 1986) 630 F.Supp. 1418, 1534–1535 [in response to discovery motion regarding sealing, government submitted affidavit of FBI agent explaining the procedures used].) Defendants' view implies that DEA Special Agent Jim Delaney, who testified before each jury (because not all the same conversations were admitted against each defendant) broke federal law by testifying in the absence of an order authorizing him to disclose the calls. Defendants had the opportunity to ask Agent Delaney about this, but did not. We will not assume the DEA broke the law.

Defendants claim their trial attorneys were incompetent because they failed to preserve these grounds. In order to prevail on such a claim, a

defendant must show trial counsel acted or failed to act in a manner below the standard of care, and that that mistake caused prejudice: that it is reasonably probable a more favorable result would have been obtained absent the mistake. (*People v. Ledesma* (1987) 43 Cal.3d 171, 216–218 [233 Cal.Rptr. 404, 729 P.2d 839].)

"Because the decision whether to object is inherently tactical, the failure to object to evidence will seldom establish incompetence." (*People v. Freeman* (1994) 8 Cal.4th 450, 490–491 [34 Cal.Rptr.2d 558, 882 P.2d 249]; see *People v. Frierson* (1979) 25 Cal.3d 142, 158 [158 Cal.Rptr. 281, 599 P.2d 587].) In a case discussing the effect of a failure to move to suppress, the California Supreme Court said: " 'Because the legality of the search was never challenged or litigated, facts necessary to a determination of that issue are lacking.' [Citation.] . . . We have repeatedly stressed 'that "[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' [Citation.] A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding." (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267 [62 Cal.Rptr.2d 437, 933 P.2d 1134].)

Defendants cannot show prejudice because they cannot show that timely objections would have resulted in the exclusion of the evidence. As for the sealing issue, Davis claims trial counsel could have no tactical reason not to object, asserting that if an objection had been made it would have succeeded. But this overlooks the fact that counsel may have known there was no impropriety regarding sealing. Absent an objection and hearing in the trial court, we will not assume the *illegality* of the sealing procedures.

Nor will we assume the *materiality* of any claimed transgressions. (See *U.S. v. Crumpton* (D.Colo. 1999) 54 F.Supp.2d 986, 1003 ["The defendants must not only demonstrate a deviation from the requirements of the statute, but this deviation must be substantial."].) Not all wiretap statute violations require suppression, only those that frustrate a central purpose of the statutory scheme. (*United States v. Donovan* (1977) 429 U.S. 413, 432–440 [50 L.Ed.2d 652, 670–675, 97 S.Ct. 658]; *Jackson, supra,* 129 Cal.App.4th at pp. 149–152; see *People v. Otto* (1992) 2 Cal.4th 1088, 1114 [9 Cal.Rptr.2d 596, 831 P.2d 1178].)

There is no claim that any of the recordings have been tampered with, the evil the sealing requirement is designed to combat. (*United States v. Ojeda Rios* (1990) 495 U.S. 257, 263 [109 L.Ed.2d 224, 234, 110 S.Ct. 1845]; see *State v. Campbell* (R.I. 1987) 528 A.2d 321, 328–329.) Davis does assert that

as to the CD (compact disc) used at trial, "this second-generation compilation CD-ROM was self-evidently inferior" to the originals. But there is no claim that some exculpatory passages were lost, or some passages could be misinterpreted in a more inculpatory way, because of the alleged loss of quality. The use of the "second-generation" recording is apparently what caused the loss of quality, not the alleged lack of appropriate sealing procedures.

Defendants mention in passing that there is no evidence the DEA properly recorded the calls to ensure their authenticity or adhered to minimization rules. If this was intended as a claim it is forfeited for lack of a proper heading. (*Alameida v. State Personnel Bd.* (2004) 120 Cal.App.4th 46, 59 [15 Cal.Rptr.3d 383].) In any event, had a timely motion or objection been made, the People could have produced evidence on this issue.

As for allowing into evidence recordings not related to narcotics, the record does not show that there was any illegality in listening to those recordings and no showing that a court order allowing their admission into evidence had not been obtained. Further, some authorities hold that there is no remedy of suppression for unlawful *disclosure* of wiretap information, if the *interception* was lawful. (See *U.S. v. Barnes* (8th Cir. 1995) 47 F.3d 963, 965; *United States v. Vento* (3d Cir. 1976) 533 F.2d 838, 855.) This may be a tactical reason why this claim was not made in the trial court.

In *Jackson*, the court reached some wiretap suppression issues that had not been preserved, partly because of its view that it would have to reach the issues by way of an incompetence of counsel claim. (*Jackson, supra*, 129 Cal.App.4th at p. 162.) Similarly, in *People v. Hart* (1999) 74 Cal.App.4th 479 [86 Cal.Rptr.2d 762], this court suggested that the effect of the failure of a trial attorney to preserve search and seizure claims can be "neutralized" by couching the claim as one of incompetence of counsel. (*Id.* at p. 486.) However, we have cautioned that where the record sheds no light on trial counsel's decisions regarding suppression of evidence, the proper course is to require the defendant to invoke habeas corpus, so the facts, including tactical reasons of trial counsel, can be determined. (*People v. Hinds* (2003) 108 Cal.App.4th 897, 900–902 [134 Cal.Rptr.2d 196].)

Because the record sheds no light on whether a "subsequent application" was made nor on the manner in which Judge Burrell sealed the recordings, we cannot conclude there were any failures to comply with the wiretap laws. Also, trial counsel may have had plausible tactical reasons for not objecting. Therefore, to pursue these points, defendants will have to invoke the remedy of habeas corpus, where relevant facts outside the record on appeal can be determined. (*People v. Mendoza Tello, supra*, 15 Cal.4th at pp. 266–267.)

B. "Necessity" for the wiretap*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

C. Corpus delicti rule

Observing that some of the recorded calls introduced against him describe acts at least arguably criminal, Munoz claims these calls should have been excluded because under the corpus delicti rule, uncharged conduct may not be proven by uncorroborated out-of-court statements. This point was raised in the trial court.

Although the corpus delicti rule applies to uncharged conduct *introduced at the penalty phase of a capital trial*, it does not apply generally to uncharged conduct.

We recently addressed the corpus delicti rule as follows:

" 'Wigmore explains [the rule] this way: every crime "reveals three component parts, *first* the *occurrence* of the specific kind of injury or loss (as in homicide, a person deceased; in arson, a house burnt, in larceny, property missing); *secondly*, somebody's criminality (in contrast, e.g., to accident) as the source of the loss,—these two together involving the commission of a crime by *somebody*; and *thirdly*, the accused's *identity* as the doer of this crime." By the great weight of authority, the first two without the third constitute the *corpus delicti*.' [Citation.]

"California distinguishes between the evidentiary and the proof sides of the corpus delicti rule since '[it] is not a requirement of federal law, and it has no basis in California statutory law.' [Citation.] The evidentiary side of the rule, that 'restrict[s] the *admissibility in evidence* of otherwise relevant and admissible extrajudicial statements of the accused,' has been abrogated by article I, section 28, subdivision (d) of the California Constitution (the 'truth-in-evidence' law [Proposition 8]). [Citation.] However, 'section 28(d) did not eliminate the independent-proof rule . . . that . . . prohibits *conviction* where the only evidence that the crime was committed is the defendant's own statements outside of court.' [Citation.]

"Thus, the rule in California: 'In every criminal trial, the prosecution must prove the corpus delicti, or the body of the crime itself—i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause. In California, it has traditionally been held, the prosecution cannot satisfy this

---

*See footnote, *ante*, page 617.

burden by relying *exclusively* upon the extrajudicial statements, confessions, or admissions of the defendant. [Citations.]' [Citation.] . . . The purpose of the corpus delicti rule is to satisfy the policy of the law that 'one will not be falsely convicted, by his or her untested words alone, of a crime that never happened.' " (*People v. Miranda* (2008) 161 Cal.App.4th 98, 107 [73 Cal.Rptr.3d 759].)

As mentioned in this quotation, the passage of Proposition 8, generally making all relevant evidence admissible in criminal cases, precludes a defendant from succeeding with a corpus delicti objection to evidence. (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1164–1165 [119 Cal.Rptr.2d 903, 46 P.3d 372] (*Alvarez*).) "On the other hand, in our view, [Proposition 8] *did not* abrogate the corpus delicti rule insofar as it provides that every *conviction* must be supported by some proof of the corpus delicti *aside from* or *in addition to* such statements, and that the jury must be so instructed." (*Id.* at p. 1165.) Accordingly, Proposition 8 does not fully dispose of Munoz's claims: *If* he is correct that the People had a duty to establish a corpus delicti of uncharged acts, the jury should have been so instructed, and we would be obliged to review the record for substantial evidence of the corpus delicti.

Most discussion about uncharged acts and the corpus delicti rule involves using uncharged acts to *satisfy* the corpus delicti rule, that is, using prior acts to corroborate that a charged crime was committed. (See Imwinkelried, Uncharged Misconduct Evidence (2006) §§ 6.4, 9.24 [and authorities cited].)

Although the main purpose of the rule is to prevent a person from being *convicted* of "a crime that never happened" (*Alvarez, supra,* 27 Cal.4th at p. 1169), the California Supreme Court has held that in *capital* cases uncharged acts admitted at the *penalty phase* must comply with the corpus delicti rule. (*People v. Hamilton* (1963) 60 Cal.2d 105, 129 [32 Cal.Rptr. 4, 383 P.2d 412] (*Hamilton*), overruled on other grounds in *People v. Morse* (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33] and disapproved on another point in *People v. Daniels* (1991) 52 Cal.3d 815, 866 [277 Cal.Rptr. 122, 802 P.2d 906]; *People v. Hines* (1964) 61 Cal.2d 164, 174 [37 Cal.Rptr. 622, 390 P.2d 398] [relying on *Hamilton*], disapproved on another point in *People v. Murtishaw* (1981) 29 Cal.3d 733, 774, fn. 40 [175 Cal.Rptr. 738, 631 P.2d 446]; *People v. Nye* (1969) 71 Cal.2d 356, 367 [78 Cal.Rptr. 467, 455 P.2d 395] [relying on *Hamilton*]; *People v. Quicke* (1969) 71 Cal.2d 502, 520–521 [78 Cal.Rptr. 683, 455 P.2d 787]; *People v. Valencia* (2008) 43 Cal.4th 268, 296 [74 Cal.Rptr.3d 605, 180 P.3d 351] [rule applied in current capital cases].) But the language in some cases lends support to Munoz's claim that uncharged acts are *generally* subject to the corpus delicti rule.

The root authority, *Hamilton*, stated as follows: "It is well settled that proof of prior crimes is admissible during the penalty phase of the trial [citations].

But no case has as yet held that such could be proved by the introduction of evidence of an extrajudicial admission without proof *aliunde* that such a crime had been committed. *It is unquestioned that during the guilt phase of a criminal trial such evidence is inadmissible in the absence of independent proof of the corpus delicti* (*People* v. *Cullen* [(1951)] 37 Cal.2d 614, 624 [234 P.2d 1]). Such is the common-law rule and rule of most other jurisdictions (7 Wigmore, Evidence (3d ed 1940) §§ 2070–2073, pp. 393–406; McCormick, Evidence (1954) § 110, pp. 229–231)." (*Hamilton, supra,* 60 Cal.2d at p. 129, some italics added.)

The italicized passage addresses the guilt phase of a criminal trial and *none of the authorities* cited by *Hamilton* involved uncharged acts, only the corpus delicti rule related to charged crimes. (See *People v. Cullen, supra,* 37 Cal.2d at pp. 624–625; McCormick, Evidence, *supra,* Corroboration, § 110, pp. 229–231; 7 Wigmore, Evidence, *supra,* Required Corroboration, §§ 2070–2073, pp. 393–406.)

This application of the corpus delicti rule was arguably expanded in *People v. Robertson* (1982) 33 Cal.3d 21 [188 Cal.Rptr. 77, 655 P.2d 279] (*Robertson*), a capital case arising out of the sexually motivated killings of two women. A witness, Kim P., testified *at the guilt phase* that over a year before the killings, Robertson forced her to orally copulate him by holding her at knifepoint and telling her he had killed two others whose bodies had not been found. (*Id.* at pp. 32–33.) In part Robertson claimed his trial attorney was incompetent because he failed to lodge a corpus delicti objection to this testimony. A plurality of the California Supreme Court said: "First, Kim P.'s testimony concerning defendant's admission of two other murders was objectionable on the ground that no independent evidence of the corpus delicti of those crimes was ever introduced. California has long adhered to the rule, established at common law and followed in most jurisdictions, that 'evidence of the commission of a prior crime may not be proved by the introduction of evidence of an extrajudicial admission without proof *aliunde* that such a crime had been committed.' [Citations.]" (*Robertson, supra,* 33 Cal.3d at p. 41.)

The plurality then stated that the evidence should have been excluded under Evidence Code section 352, but concluded the error was harmless as to the verdicts and special circumstance findings, because of overwhelming evidence. (*Robertson, supra,* 33 Cal.3d at p. 42.) The plurality later found prejudice as to penalty, because the trial court failed to instruct that the other crimes could only be deemed aggravating circumstances for *penalty* purposes if they had been proven beyond a reasonable doubt, and referred to the evidence as "a confession which, but for counsel's inexplicable failure to object, never should have been before the jury." (*Id.* at pp. 54–55.) Justice

Broussard, who provided the necessary fourth vote, did not address the corpus delicti rule, but agreed the evidence should have been excluded under Evidence Code section 352, and that error *coupled with* the failure to give proper instructions at the penalty phase, as well as a portion of the prosecution's argument, compelled reversal. (33 Cal.3d at pp. 62–63 (conc. opn. of Broussard, J.).) Justice Mosk dissented, joined by Justices Richardson and Reynoso, concluding, "The statement of defendant to Kim P. that he had killed 'two others' was part of the res gestae of the offense committed on her" and was not a confession. (*Id.* at p. 63 (dis. opn. of Mosk, J.).)

Thus, the *Robertson* plurality's statement that the corpus delicti rule applied generally to uncharged acts, not just at the penalty phase, did not command a majority of the court. But it led to *People v. Williams* (1988) 44 Cal.3d 883 [245 Cal.Rptr. 336, 751 P.2d 395], a capital case in which the People uncritically conceded, *as to guilt phase evidence*, that "the corpus delicti rule is applicable to evidence of uncharged crimes introduced to prove the commission of those crimes." (*Id.* at pp. 910–911.) The *Williams* court mentioned the concession, but found sufficient corroboration. (*Id.* at p. 911.) Thus *Williams*, too, did not actually *hold* that the corpus delicti rule applied to uncharged conduct generally.

A later decision reviewed several of these authorities and concluded, "The reference [in *Robertson*] to the common law and most jurisdictions is one we have been unable to confirm." (*People v. Denis* (1990) 224 Cal.App.3d 563, 570 [273 Cal.Rptr. 724] (*Denis*) [in part relying on more recent versions of those treatises, and other learned works].) *Denis* concluded the California Supreme Court had only actually *applied* the rule in the penalty phase context. (*Id.* at pp. 568–569.) "In addition, both Wigmore and McCormick question the need for the corpus delicti rule itself. . . . We are, therefore, unwilling to expand the rule to cover evidence of uncharged conduct, offered for a limited purpose under Evidence Code section 1101, subdivision (b)." (*Id.* at p. 570, citations omitted.)

We agree with *Denis*. (See *People v. Martinez* (1996) 51 Cal.App.4th 537, 543–545 [59 Cal.Rptr.2d 54] [approving *Denis*].) Since *Denis* was decided the California Supreme Court noted the point *Denis* makes, but has not resolved the question. (*People v. Horning* (2004) 34 Cal.4th 871, 899 [22 Cal.Rptr.3d 305, 102 P.3d 228]; *People v. Clark* (1992) 3 Cal.4th 41, 124 [10 Cal.Rptr.2d 554, 833 P.2d 561] ["It is not clear that the corpus delicti rule applies to other crimes evidence . . . ."].) We conclude the issue is not foreclosed by precedent. (See also 1 Witkin & Epstein, Cal. Criminal Law, *supra*, Elements, § 46, p. 252; Simons, Cal. Evidence Manual (2008) § 6.21, p. 467.)

We have surveyed the "common law" to the extent it addresses this issue, and we have found no authority supporting Munoz's position and ample authority against it.

Several other states, with similar evidentiary rules, have concluded that the corpus delicti rule does not apply to uncharged acts. (See *Com. v. Edwards* (2006) 588 Pa. 151, 184–185 [903 A.2d 1139, 1158] ["appellant's confession to Porter was not to the murders and other offenses with which he was charged, but rather concerned an uncharged robbery that occurred prior to the crimes at issue. In [such a case] there was no possibility that appellant's confession would lead to his conviction for an earlier robbery with which he was not charged, and thus the purpose of the *corpus delicti* rule is not implicated."]; *State v. Davis* (2002) 71 Conn.App. 641, 645, fn. 4 [803 A.2d 363, 366, fn. 4] ["defendant's assertion that evidence of uncharged misconduct must satisfy the corpus delicti rule is misplaced because that rule applies to *charged* misconduct, not uncharged misconduct"]; *State v. Rehberg* (Mo.Ct.App. 1995) 919 S.W.2d 543, 550 ["a thorough reading of the cases dealing with the rule for admissibility of evidence of uncharged crimes does not reveal any requirement of such proof [of corpus delicti] as to the uncharged crimes"]; *State v. Alatorre* (Ct.App. 1998) 191 Ariz. 208, 212, fn. 5 [953 P.2d 1261, 1265, fn. 5]; *State v. Armstrong* (Ct.App. 1993) 176 Ariz. 470, 474 [862 P.2d 230, 234] ["an admission by defendant to an uncharged offense may, if relevant and otherwise admissible, be admitted at trial absent independent proof of that offense"].)

Federal Rules of Evidence, rule 404 (28 U.S.C.), is similar to California Evidence Code section 1101 in that it generally forbids the use of character evidence, except to show motive, plan, knowledge, and so forth. (See *People v. Beuer* (2000) 77 Cal.App.4th 1433, 1439, fn. 2 [92 Cal.Rptr.2d 572]; *Holdgrafer v. Unocal Corp.* (2008) 160 Cal.App.4th 907, 932, fn. 14 [73 Cal.Rptr.3d 216].) The leading federal practice treatise makes this pertinent observation: "The reasonable doubt standard is not the only rule of sufficiency that is inapplicable when a prior crime is being used for evidentiary purposes. It has been held that the two-witness rule does not apply to proof of an act of perjury not charged in the indictment. By analogy, it would seem that other rules dealing with the sufficiency of evidence, *such as those requiring corroboration of certain kinds of testimony*, should be held to apply only when the defendant is charged with the crime and not when the crime is being used as evidence under Rule 404(b)." (22 Wright & Graham, Federal Practice and Procedure (1978) Character Evidence: Procedure, § 5249, p. 535, italics added, fn. omitted.)

■ The use of other crimes evidence, generally, is not subject to special standards of proof: A jury may find the prior acts occurred by applying the

preponderance of the evidence standard. (See CALJIC No. 2.50; *People v. Medina* (1995) 11 Cal.4th 694, 764 [47 Cal.Rptr.2d 165, 906 P.2d 2] ["at the penalty phase, it is appropriate to require proof beyond a reasonable doubt as to defendant's other crimes, given the high potential for prejudice. To require such exacting proof at the guilt phase, however, could convert the guilt phase into a series of collateral minitrials conducted whenever the People seek to rely on such evidence to assist in proving defendant's identity, intent or similar element of the charged offense."]; *People v. Durham* (1969) 70 Cal.2d 171, 187, fn. 15 [74 Cal.Rptr. 262, 449 P.2d 198].)

In a case predating *Hamilton, supra,* 60 Cal.2d 105, the California Supreme Court stated: " 'In effect, we recently held in *People v. Thorne* [(1938)] 10 Cal.2d 705, 708 [76 P.2d 491], that evidence which merely *tends* to show an attempt to commit or the commission of other offenses is admissible to prove common scheme or plan *even though it falls short of proving the* corpus delicti *of such other offenses.*' " (*People v. Lisenba* (1939) 14 Cal.2d 403, 431 [94 P.2d 569], some italics added; see *People v. Keene* (1954) 128 Cal.App.2d 520, 525–526 [275 P.2d 804] [citing *Lisenba* on this point]; *People v. Kerns* (1955) 134 Cal.App.2d 110, 114 [285 P.2d 81] [quoting *Lisenba*]; 21 Cal.Jur.3d (2001) Criminal Law: Trial, § 530, p. 875, citing *Keene*.) The cited case concluded that it was not necessary to show all the elements of a *crime* in order for other acts evidence to be admissible. (*People v. Thorne, supra,* 10 Cal.2d at p. 708.) Although *Lisenba* predates cases such as *Hamilton*, which can be read broadly to state a contrary rule, we decline to apply the broad reading of the language in those cases. (See also *People v. Kelley* (1967) 66 Cal.2d 232, 245, fn. 7 [57 Cal.Rptr. 363, 424 P.2d 947] [evidence of other acts "is apparently allowed to be shown by extrajudicial admissions of defendant alone without corroborating evidence"].)

■■■ *Hamilton, supra,* 60 Cal.2d 105, and subsequent cases carved out a narrow exception for penalty trials, albeit without using narrowly carved language; the corpus delicti rule is not applicable to uncharged act evidence, except in penalty trials. Therefore, we reject Munoz's claim that the rule has any application to this case.

D., E.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

IV.–VII.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante,* page 617.

## DISPOSITION

The judgment as to Munoz is affirmed. The judgment as to Davis is modified to award him 625 days of presentence custody credits and otherwise affirmed. The trial court is directed to forward to the Department of Corrections and Rehabilitation new abstracts of judgment in accordance with this opinion.

Davis, Acting P. J., and Hull, J., concurred.

The petitions of both appellant Michael Aaron Davis and appellant Javier Munoz for review by the Supreme Court were denied March 11, 2009, S169208.