Filed 9/24/13  P. v. Trull CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
|     Plaintiff and Respondent, | E056310 |
| v. | (Super.Ct.No. RIF10003540) |
| KEITH DWAYNE TRULL, | OPINION |
|     Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Michael B. Donner, Judge.  Affirmed.

Michael Clough, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, and Barry Carlton and William M. Wood, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Larry Dwayne Trull reported to his insurance company that his motorcycle had been stolen.  He denied having been the victim of any previous motorcycle thefts.  Just a year and a half earlier, however, he had reported another motorcycle as stolen to another insurance company.  Both times, he made the claim within months after purchasing the motorcycle; both times, he had insured it for more than its purchase price; and both times, he claimed that it had disappeared from outside a restaurant.  A tipster told defendant's insurance company that defendant had "arrange[d]" for his motorcycle to be stolen and had "done [it] before."  The resulting investigation revealed that defendant had told coworkers that, to solve his financial problems, he was planning to "make [the motorcycle] disappear and do an insurance claim . . . ."

After a jury trial, defendant was found guilty of presenting a fraudulent insurance claim (Pen. Code, § 550, subd. (a)(1)) and presenting a false statement in support of an insurance claim (Pen. Code, § 550, subd. (b)(1)).  Defendant was placed on probation for four years, on conditions including a 210-day jail term.

Defendant now contends:

1.  The trial court erred by admitting evidence of defendant's previous insurance claim, because there was no evidence that the previous claim was false.

2.  There was no evidence that defendant's current insurance claim was false because there was no evidence that his motorcycle was not, in fact, stolen.

3.  The trial court erred by excluding evidence of the tipster's identity.

4.  The prosecutor committed misconduct.

2

5.  To the extent that defense counsel forfeited defendant's prosecutorial misconduct claims by failing to object, he rendered constitutionally ineffective assistance.

We find no error.  Hence, we will affirm.

I

FACTUAL BACKGROUND

A.     *Prosecution Case.*

In fall 2009, defendant worked for a company that was building military housing at Camp Pendleton.  His supervisor was James Haughton, Jr.  He and Haughton were also friends.  Haughton was a reluctant witness; before trial, he had avoided returning the prosecution's phone calls.

Haughton testified that, in or around August 2009, defendant said he had "too many toys" and he "needed to get rid of some" because of his financial problems.  Defendant owned both a motorcycle and a boat, but he wanted to keep the boat for his children.

Defendant said he knew it would be easy to get rid of the motorcycle, because "[h]e had done it before."  He had "[t]ake[n] it to a restaurant or claim[ed] it was at a restaurant and that's where it . . . was stolen from."  He explained that "you could make it disappear and do an insurance claim and they give you what it's worth versus what you may owe on it."  He said you could "burn a bike" or "[b]ury it out in [the] desert."  He could sell all the parts, except the engine block and the frame, because they had the VIN number.

3

Shortly after these conversations, Haughton had defendant removed from his jobsite and reassigned because defendant "wasn't performing his job . . . ." Defendant filed a "work-related complaint" against Haughton, alleging that Haughton had made a racist remark and had used profanity. That complaint was found to have "no basis." Haughton admitted having some "hard feelings" against defendant.

David Haney worked with defendant at Camp Pendleton for about two months in the fall of 2009. Haughton was not Haney's supervisor. Like Haughton, Haney was a reluctant witness and had avoided returning the prosecution's phone calls.

Haney and defendant both owned the same model of Harley-Davidson, and they talked about motorcycles. Haney testified that defendant said he was having financial problems. He said he needed to get rid of some of his "toys," and he would rather keep his boat than his motorcycle. He told Haney, "I know you know people; help me get rid of the bike." Haney "took offense," because he understood defendant to be suggesting something illegal.

In August 2009, defendant phoned Haney and offered to sell him his motorcycle for $2,400. This was considerably less than it was worth. About a week later, defendant phoned Haney again and offered to sell him the motorcycle for $500. Another week later, defendant called Haney a third time and offered to sell him parts from his motorcycle.

On October 24, 2009, at about 3:20 p.m., defendant phoned the Murrieta Police Department and reported that his motorcycle had been stolen. Sergeant Robert Anderson

4

responded. He contacted defendant in the parking lot of a Carl's Jr. Defendant said his motorcycle had stalled as he was riding it, so he pulled into the parking lot. When he could not restart it, he left it there, with the alarm and the "kill switch" on. Sergeant Anderson interviewed several people in nearby businesses, but found no one who had heard an alarm.

At about 4:20 p.m., defendant phoned GEICO, which had insured the motorcycle, and reported it stolen. He later told Haney, "I got rid of it like my last one."

On October 26, 2009, William Nielson, a GEICO employee, phoned defendant and obtained a recorded statement from him. Defendant said he had had "bad gas or a fouled spark plug," so at 1:10 p.m., he parked the motorcycle at a Carl's Jr. He left the ignition locked and the "silent alarm" on. He phoned his ex-wife to ask her for a ride, but she was not in, so he walked home, where he got a ramp and tie-downs. When he got back, around 3:10 p.m., the motorcycle was missing.

Sergeant Anderson, however, did not remember seeing defendant's pickup truck in the area.

According to phone company records, no calls had been made to defendant's ex-wife that day from either his personal cell phone or his work cell phone.

An expert on Harley-Davidsons testified that defendant's motorcycle weighed 650 to 750 pounds. It would be hard for one person, alone, to roll it up a standard-sized ramp into the bed of a pickup.

5

The expert also testified that, if the fork lock was locked, the front wheel would be turned to the left and locked in place; a thief would only be able to push the motorcycle around in a circle. He conceded, however, that it could be moved in a straight line by putting a wheel dolly under the front wheel. He also conceded that a screwdriver can be used to break a fork lock. According to the expert, some Harley-Davidsons have a silent alarm that merely causes the turn signals to flash.

In the recorded statement, Nielson asked, "Have you ever had a vehicle stolen before[?]" Defendant answered, "Yeah[,] I had my Honda Accord stolen," adding that that was 20 years ago.

In April 2008, however, defendant had reported a stolen motorcycle to the police and to his then-insurance carrier, Progressive. He said it had been stolen from a restaurant in Lake Elsinore while he and his girlfriend were inside eating. He had purchased the motorcycle in January 2008. The purchase price was about $26,800. However, he had insured it for $33,000, based on upgrades that he claimed to have made. Thus, the insurance payout was enough to pay the lienholder $17,000 and still give defendant about $18,000 in cash.[1]

In March 2009, defendant bought the Harley-Davidson. In his insurance application, he stated that no vehicles had been stolen from him in the previous five years.

---

[1] The record does not explain the discrepancy between the $33,000 value of the policy and the $35,000 total payout.

The purchase price was $15,225, and originally, defendant obtained only a standard policy that valued it as "a stock Harley." In August 2009, however, he added coverage of up to $4,500 for accessories, claiming that he had installed accessories since the purchase.

On December 10, 2009, Michelle Howe, a GEICO employee, got a phone call from a tipster. The caller said that defendant had filed a theft claim, that he "was trying to arrange [for] his motorcycle to be stolen[,] and that it had been done before."

Howe had Penny Richter, yet another GEICO employee, investigate the tip. Richter phoned the tipster; she then phoned Haughton and Haney.

On January 13, 2010, Richter obtained a second recorded statement from defendant. Once again, Defendant said that he had called his ex-wife from his cell phone. He also said that he had last filled up his gas tank at a USA station on California Oaks Road. However, there was no such station.

Defendant admitted, for the first time, that he had made a previous stolen motorcycle claim to Progressive. Richter pointed out that he had been asked, in his first recorded statement, if he had any prior thefts. He claimed that he had merely been asked if he had made prior theft claims to GEICO.

GEICO eventually paid the claim, paying $14,453 to the lienholder and $4,480 to defendant.

7

B.    *Defense Case.*

Defendant testified that both Haughton and Haney were lying. He claimed that Haughton and his wife had asked defendant and his girlfriend to engage in "sexual acts" with them, which defendant "didn't want to do." After that, Haughton became "aggressive" and "insultive" at work. Hence, defendant and Haughton were "feuding."

Defendant admitted that he had no "feud" with Haney, and that Haney had no apparent motive to lie.

Defendant claimed that he did not disclose the previous motorcycle theft because he was asked about thefts of a "vehicle," and he thought this meant "car."

II

THE ADMISSIBILITY OF DEFENDANT'S

2008 PROGRESSIVE STOLEN MOTORCYCLE CLAIM

Defendant contends that the trial court erred by admitting evidence of his prior insurance claim, because there was no evidence that the prior claim was fraudulent.

A.    *Additional Factual and Procedural Background.*

The prosecutor filed a motion in limine arguing that the prior insurance claim was admissible to show "intent, motive, modus operandi, . . . lack of mistake/accident, and common scheme . . . ."

Defendant filed a motion in limine to exclude this evidence, arguing, among other things, that there was no evidence that the prior claim was fraudulent.

The trial court ruled that the evidence was admissible.

The jury instructions noted that "[t]he People presented evidence that the defendant committed another offense of insurance fraud"; they instructed the jury to consider this evidence only if the People had proved by a preponderance of the evidence that defendant had committed an uncharged offense, and even then only as evidence of intent, motive, knowledge, or plan or scheme. (CALCRIM No. 375.)

B.     *Analysis*.

As a general rule, character evidence — including character evidence in the form of a specific instance of conduct — is inadmissible to prove conduct on a specified occasion. (Evid. Code, § 1101, subd. (a).) However, a specific instance of conduct is admissible when relevant to prove some fact other than a mere disposition to engage in such conduct. (Evid. Code, § 1101, subd. (b).) For example, it is admissible when it is relevant to prove intent, plan, or absence of mistake or accident. (*Ibid*.) "[T]o be admissible such evidence 'must not contravene other policies limiting admission, such as those contained in Evidence Code section 352. [Citations.]' [Citation.]" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404.)

"'"We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code sections 1101 and 352." [Citation.]' [Citation.]" (*People v. Fuiava* (2012) 53 Cal.4th 622, 667-668, fn. omitted.)

Preliminarily, the prior claim was relevant, even assuming that, as defendant argues, there was no evidence that it was fraudulent. Defendant could well have submitted a perfectly honest insurance claim and then, once that was successful, have

9

used that as a template for submitting a successful but fraudulent claim. Even assuming the prior claim was legitimate, it was extremely unlikely that, within a year and a half, defendant would be the victim of a second motorcycle theft, where both times, the motorcycle was allegedly stolen less than six months after purchase, the motorcycle was insured for more than its purchase price, and the motorcycle was allegedly stolen after defendant left it outside a restaurant. Thus, even a nonfraudulent prior claim was relevant to intent and plan.

The jury instruction did not limit the jury to considering the prior claim only if it was fraudulent. The instruction stated that the jury could consider the "evidence that the defendant committed another offense of insurance fraud" only if the People proved that defendant had committed an uncharged offense. This left the jury free to consider evidence of an honest prior claim for any purpose for which it was relevant.

In any event, even assuming the jury understood the instruction as applying to evidence of a nonfraudulent prior claim, that would have meant that it had to disregard such evidence if the People failed to prove that it constituted an uncharged offense. This could only have benefited defendant.

Separately and alternatively, even assuming there had to be evidence that the prior claim was fraudulent, there was ample evidence of this. Defendant told Haughton that he had gotten rid of a previous motorcycle by "claim[ing] it was at a restaurant and that's where it . . . was stolen from." He described a fraudulent scheme and said that he had

10

"done it before."  After the motorcycle was gone, he told Haney "I got rid of it like my last one."

Defendant argues that, under the corpus delicti rule, his statements were insufficient to prove fraud.[2]  It has been held, however, that the corpus delicti rule does not apply to uncharged criminal acts admitted under Evidence Code section 1101, subdivision (b).  (*People v. Davis* (2008) 168 Cal.App.4th 617, 633-638; *People v. Martinez* (1996) 51 Cal.App.4th 537, 543-545; *People v. Denis* (1990) 224 Cal.App.3d 563, 568-570.)

We therefore conclude that the trial court properly admitted the evidence of defendant's prior insurance claim.

III

THE SUFFICIENCY OF THE EVIDENCE OF FALSITY

Defendant contends that there was insufficient evidence that his Harley-Davidson was not, in fact, stolen.

"'[W]hen a defendant challenges the sufficiency of the evidence, "'[t]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence — that is, evidence which is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'  [Citation.]"  [Citations.] . . .

---

[2]    The People, somewhat unhelpfully, do not respond to this argument.

11

"Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence. [Citation.]" [Citation.] We "'"presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."' [Citation.]" [Citation.]' [Citation.]" (*People v. Lopez* (2013) 56 Cal.4th 1028, 1069.)

For purposes of count 1 (presenting a fraudulent insurance claim), the People had to prove that defendant's insurance claim was false or fraudulent. (Pen. Code, § 550, subd. (a)(1).) Similarly, for purposes of count 2 (presenting a false statement in support of an insurance claim), the People had to prove that he made a materially false or misleading statement in support of his insurance claim. (Pen. Code, § 550, subd. (b)(1).) The only even arguably materially false statement shown by the evidence was that the motorcycle was stolen.[3] The evidence that the motorcycle was not, in fact, stolen was as follows.

First and foremost, there were defendant's statements to Haughton and Haney. He told Haughton that he needed to "make [the motorcycle] disappear" because of his financial problems. He discussed a number of alternative plans for making it disappear, including burying it, burning it, and selling off the parts. He also discussed a plan for

---

**3** At first glance, it might seem that defendant could have been found guilty based on his various statements that he had not been the victim of a previous motorcycle theft. The People's theory, however, was that this was *true* — the prior theft was staged. Moreover, even if this statement was false, it was not *material*. Defendant eventually disclosed the prior theft claim to GEICO, but it paid his current claim anyway.

12

claiming it had been stolen from a restaurant. Defendant actually offered to sell the motorcycle to Haney at a suspiciously low price, or to sell him parts from the motorcycle.

Defendant asks us to disregard Haughton and Haney's testimony, for three reasons.[4] First, they testified that defendant made these incriminating statements in August 2009; defendant argues that the statements therefore are not evidence that the motorcycle was not stolen in October 2009. However, precisely because the statements were made before the motorcycle disappeared, they are evidence of planning, which in turn is evidence that the plan was executed. The passage of a few weeks or months does not make them irrelevant for this purpose.

Second, defendant argues that his statements suggesting various ways that he *could* get rid of the motorcycle are not evidence that he *did* get rid of the motorcycle. However, this is a reasonable inference, especially when combined with the fact that the motorcycle *did* disappear. This is all the more true because, in his statements, defendant planned to claim that the motorcycle had been stolen from a restaurant, and ultimately, that is what he did claim.

Third, defendant attacks the witnesses' credibility. However, "'[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the

---

**4** Defendant does *not* contend that Haughton and Haney's testimony was insufficient under the corpus delicti rule. (See generally *People v. Alvarez* (2002) 27 Cal.4th 1161, 1177-1180.) Accordingly, he has forfeited any such contention.

13

credibility of a witness and the truth or falsity of the facts upon which a determination depends.' [Citation.] Unless it describes facts or events that are physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction. [Citation.]" (*People v. Elliott* (2012) 53 Cal.4th 535, 585.)

In addition to defendant's statements to Haughton and Haney, there was also defendant's prior 2008 stolen motorcycle claim to Progressive. As we have already held, this evidence was relevant and admissible to show intent and plan. As we have also already held, there was sufficient evidence (i.e., defendant's statements to Haughton and Haney) that the motorcycle in 2008 was not stolen; but even if it was stolen, the similarities between the two reported disappearances indicated that defendant fabricated the second disappearance.

Finally, defendant evidently lied about the circumstances of the supposed theft. He claimed that he had just bought gas at a USA station on Cal Oaks, but there was no USA station on Cal Oaks. He claimed that he phoned his ex-wife to ask for a ride, but his phone records contradicted this. He claimed that he was going to take the motorcycle home in his truck, but there was evidence that it would have been infeasible for a single person to push it up a standard ramp into a truck bed. And he concealed his prior motorcycle theft claim from GEICO. These lies are evidence of consciousness of guilt, which in turn is evidence that defendant was not the mere victim of a theft.

IV

THE ADMISSIBILITY OF THE IDENTITY OF THE TIPSTER

Defendant contends that the trial court erred by excluding evidence of the identity of the tipster.

A.    *Additional Factual and Procedural Background.*

In a motion in limine, the prosecutor objected to any questions regarding the "[a]nonymous [c]aller['s]" name, as irrelevant and more prejudicial than probative.

At the hearing on the motion, defense counsel argued that the evidence was relevant to show that Haughton was involved in the call to GEICO.  He represented that the tipster identified herself as "Iris."[5]  He also pointed out that, at defendant's first trial, Richter had "specifically testified that it was the wife of Mr. Haughton."[6]

The prosecutor conceded that the tipster may have identified herself as Haughton's wife but argued that there was no way of knowing who she really was.

---

[5]    According to evidence presented later at trial, Haughton's wife's name was Iris.

[6]    Defendant had to be retried after his first trial ended in a hung jury. Defense counsel was referring to the following testimony by Richter at the first trial:

"A.  Initially I contacted a tipster named Laura.

"Q.  Okay.  And then who did you contact after that?

"A.  I spoke with her husband, Russ Haughton."

15

The trial court excluded the evidence, ruling, "[I]t's not relevant. Also, there is a[n] issue regarding the validity of any name given . . . ." However, it offered to let either side reopen the issue by requesting an Evidence Code section 402 hearing. It also pointed out that the defense could interview or subpoena Haughton's wife.

When Howe was on the stand, she testified:

"Q Tell me about how you first became aware to this claim.

"A I received a phone call. . . .

"Q Okay. An anonymous phone call?

"A Correct."

Howe testified generally about the contents of the phone call.

On cross-examination, defense counsel started to ask about the contents of the conversation. The prosecutor objected, "Hearsay and 402." The trial court ruled that defense counsel could ask about the contents of the conversation, but it reaffirmed its ruling that he could not ask about the tipster's identity.

Later, when Richter was on the stand, she testified:

"Q Now, when you first learned of this claim, what was the first thing you did?

"A Reviewed the claim file.

"Q What is the next thing you did? [¶] . . . [¶] . . .

"A . . . I actually called the anonymous caller."

At the next break, the trial court stated:

"THE COURT: . . . I don't recall anybody telling me that Ms. Richter actually contacted this anonymous caller. . . . I recall there being statements made about an anonymous caller, and there were, clearly, foundational issues with respect to who that really was . . . . We had no way to lay that foundation. But it appears as if Ms. Richter actually called this person. Did I understand her correctly?

"[PROSECUTOR]: That's what she testified to.

"THE COURT: Did she actually connect to someone?

"[PROSECUTOR]: I don't know. This is the first time I'm hearing about it. I don't know.

"THE COURT: Because if she did, this has to be revisited in terms of the defense's previous desire to go into who that was, because that's far different than receiving an anonymous call."

The prosecutor filed a supplemental brief, objecting to evidence of the tipster's identity as hearsay. In it, she represented that on December 10, 2009, the tipster phoned GEICO (i.e., Howe). The tipster was female and left a name and a phone number. On December 16, 2009, Richter called the tipster's phone number. The person who answered identified herself as "Laura." That was not the name (i.e., Iris) that the tipster had given Howe.

After hearing further argument, the trial court excluded the evidence as inadmissible hearsay.

17

B.     *The Admissibility of the Tipster's Identity.*

Defendant contends that the trial court erred by excluding evidence of the tipster's identity.

Any testimony, however, by either Howe or Richter about the tipster's identity would be hearsay and not based on personal knowledge, because it would necessarily be based on whatever name the tipster gave.  (Evid. Code, §§ 702, 1200.)

Defendant concedes that Howe "probably" had no independent knowledge of the tipster's identity.  He argues, however, that Richter did have such knowledge.  He notes that in defendant's first trial, Richter testified that, after speaking to the tipster, "I spoke with her husband, Russ Haughton."  For all that appears, however, this just means that the tipster identified herself not only as "Laura" but also as "Russ Haughton's wife."  Both self-identifications were hearsay.

It was potentially significant, as the trial court noted, that Richter phoned the tipster, because this meant that she had nonhearsay proof of the tipster's phone number.  Defense counsel, however, never offered to prove what phone number Richter called and never offered to prove that it was Haughton or Haughton's wife's phone number.  Thus, there is no evidence that Richter had any nonhearsay way of identifying the tipster.

Defendant argues that he was prejudiced because the fact that the tipster was Haughton's wife would have supported his claim at trial that Haughton was framing him.  This theory of relevance only works, however, if the caller really was Haughton's wife.

18

If the caller was lying about this, then the evidence was not relevant for this purpose. This confirms that defendant was seeking to admit the evidence for its truth.

Defendant also argues that the evidence was admissible for the nonhearsay purpose of "establish[ing] . . . Richter's state of mind and why she quickly called Haughton . . . ." Defense counsel forfeited this theory of relevance by failing to assert it below. (Evid. Code, § 354, subd. (a).) Indeed, the trial court never precluded him from asking Richter *why she called Haughton*. Defendant speculates that the answer would have been that the tipster had identified herself as Haughton's wife. However, the tipster must have said more than that. After all, up until that phone call, Richter did not even know who Haughton was. At a minimum, the tipster must have said that Haughton had information that would support her tip and must have given his phone number. Richter *could have* testified to all this without testifying that the tipster *also* claimed to be Haughton's wife.

In any event, it was not particularly relevant why Richter called Haughton. It would have been obvious to the jury that she did so based on *something* the tipster said. To the extent that her reason for calling Haughton remained unclear, that would seem to favor the defense, not the prosecution.

Defendant also argues that the evidence was relevant to impeach Haughton, because Haughton testified that he did not know how GEICO "got on to" him. There was no evidence, however, that he *knew* that his wife had called GEICO, or that Richter *told him* that his wife had called GEICO. Arguably *that* evidence would have been

19

admissible to impeach. Absent evidence that Haughton *knew* that his wife was the tipster, however, the tipster's mere hearsay statement that she was his wife was not relevant to impeach him.

Finally, defendant does not claim that there was any applicable hearsay exception. In the trial court, defense counsel referred in passing to the contemporaneous statement exception (Evid. Code, § 1241); however, when the trial court said, "The question is[,] is there any exception to the hearsay rule," he conceded, "At this point, no, your Honor." "The proponent of hearsay has to alert the court to the exception relied upon . . . ." (*People v. Livaditis* (1992) 2 Cal.4th 759, 778.) Accordingly, defense counsel forfeited reliance on any exception. (*People v. Ramos* (1997) 15 Cal.4th 1133, 1178.)

Defendant argues that the exclusion of the evidence violated his right to due process and to present a defense. However, the trial court did not preclude defendant from presenting nonhearsay evidence of the tipster's identity. Defense counsel could have interviewed Haughton's wife at any time; if she would not talk to him, he could have subpoenaed her. The trial court even suggested that defense counsel interview Haughton's wife. Either he did interview her, and she denied being the tipster, or he did not interview her, because he knew she would deny being the tipster.

It is not clear whether defendant is arguing that his right to present a defense was violated *even if* the only evidence supporting it was inadmissible hearsay — i.e., that due process trumps state hearsay law. If only out of an excess of caution, then, we note that: "The complete exclusion of defense evidence could '"theoretically could rise to [the]

20

level'" [citation] of a due process violation. But short of a total preclusion of defendant's ability to present a mitigating case to the trier of fact, no due process violation occurs; even "'[i]f the trial court misstepped, '[its] ruling was an error of law merely; there was no refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense.'"' [Citation.]" (*People v. Thornton* (2007) 41 Cal.4th 391, 452-453.) Thus, there was no due process violation.

V

PROSECUTORIAL MISCONDUCT AND INEFFECTIVE ASSISTANCE

OF COUNSEL IN FAILING TO OBJECT TO PROSECUTORIAL MISCONDUCT

Defendant argues that the prosecutor committed misconduct in three specified respects. To the extent that defense counsel forfeited defendant's prosecutorial misconduct claims by failing to object, defendant contends that he rendered constitutionally ineffective assistance.

A.     *General Legal Principles*.

"A prosecutor's conduct violates the federal Constitution when it infects the trial with such unfairness as to make the resulting conviction a denial of due process. Conduct by a prosecutor that does not rise to this level nevertheless violates California law if it involves the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury. [Citations.]" (*People v. Whalen* (2013) 56 Cal.4th 1, 52.)

"[T]he term prosecutorial 'misconduct' is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt

21

description of the transgression is prosecutorial error." (*People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)

"'"[A] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion — and on the same ground — the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]"' [Citations.]" (*People v. Pearson* (2013) 56 Cal.4th 393, 426.)

"'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. [Citations.] A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel. [Citations.] If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. [Citation.]' [Citation.]" (*People v. Gamache* (2010) 48 Cal.4th 347, 391.)

B.     *Misstatement to the Trial Court.*

1.     *Additional factual and procedural background.*

As mentioned (see part IV.A and fn. 5, *ante*), at defendant's first trial, Richter testified:

"A.  Initially I contacted a tipster named Laura.

"Q.  Okay.  And then who did you contact after that?

"A.  I spoke with her husband, Russ Haughton."

In the second trial, after Richter testified that she phoned the tipster, and after the trial court expressed surprise, the prosecutor claimed that this was news to her:  "This is the first time I'm hearing about it."[7]

2.     *Analysis.*

Defendant argues that the prosecutor must have known, from the transcript of the first trial, that Richter had phoned the tipster; thus, she committed misconduct by representing to the trial court that she had been unaware of this.

Defendant insists that "[t]his . . . misconduct is central to all of [his] claims." *Au contraire* — it is an irrelevant sideshow.  It must be remembered that Richter had *only just volunteered* that she *did* phone the tipster.  The prosecutor's supposed misconduct did not conceal this information from the trial court.  It only concealed — at most — the date *when the prosecutor first learned this information.*

---

[7]     The prosecutor in the first trial was a different deputy district attorney.

23

At that point, however, the prosecutor's knowledge was irrelevant. Defendant claims there is a reasonable probability that, but for the prosecutor's misconduct, the trial court would have allowed him to introduce evidence of the tipster's name. But that makes no sense. *Before* Richter said she phoned the tipster, it appeared that she had no way of knowing who the tipster was. *After* Richter said she phoned the tipster, it appeared that she may have known who the tipster *claimed* to be, but she still had no *personal* knowledge — her knowledge was based on hearsay. Either way, the trial court correctly excluded evidence of the tipster's name. And either way, when *the prosecutor first learned* that Richter phoned the tipster had absolutely nothing to do with the admissibility of the evidence.

We therefore conclude that the prosecutor's statement did not constitute prosecutorial misconduct under federal law; and even assuming it constituted prosecutorial misconduct under state law, it was not prejudicial. (See *People v. Fuiava*, *supra*, 53 Cal.4th at p. 692 ["There is no reasonable probability that, when compared to what would have been a correct statement . . . , the prosecutor's inaccurate statement was so prejudicial that it could have affected the jury's verdict."].)

We also note that defense counsel forfeited this claim by failing to object. Defendant does not exactly contend that this constituted ineffective assistance. However, he does contend that it was ineffective assistance not to inform the trial court of Richter's testimony at the first trial.

24

We can only repeat that, at this point, this was irrelevant. As already discussed at length, there was no evidence that Richter's knowledge was based on anything other than hearsay. Thus, defense counsel's failure to point to Richter's testimony at the first trial was not ineffective assistance and, moreover, it was not prejudicial.

C. *Reliance on the Tipster's Hearsay Statements.*

1. *Additional factual and procedural background.*

In closing argument, the prosecutor stated: "Is that just a coincidence that both witnesses testified *and that you heard that the anonymous caller testified* that he had [done it before]? No." (Italics added.)

She also stated: "[H]e full-on says he did it before and he did it again to enough people that *we've got an anonymous caller* and two other individuals who know the facts of this." (Italics added.)

2. *Analysis.*

Defendant argues that the prosecutor improperly asked the jury to consider the tipster's statements for their truth, even though they were inadmissible hearsay when used for this purpose.

When evidence has been admitted for a limited purpose, it is misconduct to ask the jury to consider it for an improper purpose. (*People v. Purvis* (1961) 56 Cal.2d 93, 99, disapproved on other grounds in *People v. Morse* (1964) 60 Cal.2d 631, 648–649.) Here, defense counsel did not object that the tipster's statements accusing defendant were hearsay. He also did not ask the trial court to instruct the jury that they could be used

25

only for a limited purpose. (See CALCRIM No. 303.) "'[U]nder a[] long-standing rule, "incompetent hearsay admitted without objection is sufficient to sustain a finding or judgment."' [Citation.]" (*People v. Baker* (2012) 204 Cal.App.4th 1234, 1245.) Thus, we are not convinced that the prosecutor committed misconduct by asking the jury to consider the statements for their truth.

Separately and alternatively, however, defense counsel once again forfeited this claim by failing to object. Defendant argues that an objection would have been futile, because it would have focused the jury's attention on the tipster's statements. "This exception, of course, would swallow the rule requiring a timely objection and request for admonition, for one always runs the risk of drawing the jury's attention to an improper line of argument by registering an objection. The mere concern of highlighting alleged misconduct by objecting, without more, cannot serve as an exception to the general rule requiring an objection and request for an admonition." (*People v. Boyette* (2002) 29 Cal.4th 381, 432.)

Defendant therefore contends that defense counsel's failure to object constituted ineffective assistance. As already noted, we have found no case holding that it is misconduct to ask the jury to consider evidence that has *not* been admitted for a limited purpose. Accordingly, defense counsel was not ineffective in failing to object to the supposed misconduct. However, this reasoning immediately raises the additional question of whether defense counsel was ineffective in failing to request a limiting instruction. Accordingly, we do not resolve defendant's contention on this ground.

26

We do conclude, however, that the asserted ineffective assistance was not prejudicial in light of the whole record. Haughton and Haney already corroborated each other. Of course, defendant claimed that Haughton was attempting to frame him. However, he could not explain why Haney would conspire with Haughton. The prosecutor's argument that the tipster corroborated Haughton and Haney was weak, at best, because there was no evidence that the tipster had any source of information other than Haughton and Haney themselves; the jury had to realize that the tipster knew Haughton and perhaps also Haney, because Richter testified that she phoned them immediately after she phoned the tipster. In all other respects, the evidence of defendant's guilt was strong. Thus, we see no reasonable possibility that, even if defense counsel had objected to the asserted misconduct, the outcome would have been any different.

D. *Misstating the Evidence in Closing Argument*.

1. *Additional factual and procedural background*.

In closing argument, the prosecutor stated: "All of the parts of the bike had to have been gone and disposed of by October 24th . . . ."

Similarly, she stated: "The bike was in pieces all over the country, probably . . . ."

Finally, she stated: "The parts were across the country."

2. *Analysis.*

Defendant claims there was no evidence that he sold parts of the bike to anyone, and therefore the prosecutor committed misconduct by misstating facts in closing argument.

"For a prosecutor to misstate the evidence is prosecutorial misconduct. [Citations.]" (*People v. Davis* (2005) 36 Cal.4th 510, 550.)  However, "'"[p]rosecutors have wide latitude to discuss and draw inferences from the evidence at trial.  [Citation.] Whether the inferences the prosecutor draws are reasonable is for the jury to decide."' [Citation.]" (*People v. Abel* (2012) 53 Cal.4th 891, 926.)

Here, there was evidence from which it was reasonably inferable that defendant had disposed of the motorcycle in parts.  Defendant had told Haughton that you could get rid of a motorcycle by selling all the parts except the engine block and the frame.  He had offered to sell Haney the motorcycle twice; when Haney would not bite, he offered to sell him parts from the motorcycle.  This strongly suggests that he had decided to dispose of it in parts.  Admittedly, he also discussed alternative ways of getting rid of a motorcycle, such as burning it or burying it.  Presumably, however — particularly in light of his financial difficulties — he would rather make some money off of it.  The bottom line is that this is one reasonable inference that the prosecutor could properly draw.

We also note that, once again, defense counsel forfeited the asserted misconduct by failing to object.  For the reasons already discussed (see part V.C.2, *ante*), an objection would not have been futile.  Defense counsel did not render ineffective

28

assistance by failing to object because, as already discussed, there was no misconduct. However, even if there was, the failure to object was not prejudicial. Precisely how defendant disposed of the motorcycle was not particularly relevant. What mattered was that he was making various plans for "disappearing" the motorcycle shortly before it, in fact, disappeared.

## VI

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI
                                    J.

We concur:

McKINSTER
            Acting P. J.

MILLER
                J.