Filed 4/9/26  In re Conner T. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re CONNER T., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, | E086716 |
| Plaintiff and Respondent, | (Super.Ct.No. DLIN2200033) |
| v. | OPINION |
| CONNER T., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Emily Benjamini, Judge.  Affirmed.

Annie Fraser, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, Donald W. Ostertag and Elana Miller, Deputy Attorneys General, for Plaintiff and Respondent.

1

The People filed a juvenile wardship petition against Conner T. alleging that he committed murder. Conner appeals from the juvenile court's order transferring him to adult criminal court under Welfare and Institutions Code section 707. (Unlabeled statutory references are to this code.) He argues that the court considered unreliable evidence, so the findings underlying the court's transfer order are not supported by substantial evidence. Conner also argues that the court erred by admitting opinion evidence regarding his credibility. In addition, he argues that the court violated the corpus delicti rule by relying on his out-of-court statements that he was involved in other murders. We affirm.

LEGAL FRAMEWORK

"Section 707 sets forth the procedures for transferring a minor from juvenile court to criminal court. It provides that whenever a minor aged 16 years or older is alleged to have committed a felony, the prosecutor may move 'to transfer the minor from juvenile court to a court of criminal jurisdiction.' (§ 707, subd. (a)(1).) The prosecution bears the burden of proving that the minor should be transferred. (Cal. Rules of Court, rule 5.770(a).)" (*In re Miguel R.* (2024) 100 Cal.App.5th 152, 164 (*Miguel R.*).)

After the People move to transfer the minor, "the juvenile court shall order the probation officer to submit a report on the behavioral patterns and social history of the minor." (§ 707, subd. (a)(1).) "Following submission and consideration of the report, and of any other relevant evidence that the petitioner or the minor may wish to submit, the juvenile court shall decide whether the minor should be transferred to a court of

2

criminal jurisdiction. In order to find that the minor should be transferred to a court of criminal jurisdiction, the court shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (§ 707, subd. (a)(3).)

The court must consider five criteria when deciding whether the minor is amenable to rehabilitation under juvenile court jurisdiction. (§ 707, subd. (a)(3)(A)-(E).) "Those criteria are (1) 'the degree of criminal sophistication exhibited by the minor' (§ 707, subd. (a)(3)(A)(i)), (2) '[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction' (§ 707(a)(3)(B)(i)), (3) '[t]he minor's previous delinquent history' (§ 707, subd. (a)(3)(C)(i)), (4) '[s]uccess of previous attempts by the juvenile court to rehabilitate the minor' (§ 707, subd. (a)(3)(D)(i)), and (5) '[t]he circumstances and gravity of the offense alleged in the petition to have been committed by the minor' (§ 707, subd.(a)(3)(E)(i)). The statute sets forth a nonexhaustive list of relevant factors for the court to consider with respect to each of the five criteria. (§ 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).)"[1] (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 164.)

---

[1] The listed relevant factors for the five criteria are: "the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense; the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior; the effect of familial, adult, or peer pressure on the minor's actions; the effect of the minor's family and community environment; the existence of childhood trauma; the minor's involvement in the child welfare or foster care system; and the status of the minor as a victim of human trafficking, sexual abuse, or sexual battery on the

*[footnote continued on next page]*

BACKGROUND

I.      *The alleged offense and the subsequent investigation*[2]

The murder victim, Jeremy Abshear, was found shot to death in May 2023.

Conner was 17 years old at the time. He turned 18 years old in July 2023, roughly two

months later. Conner and four other individuals were involved in the shooting. The

other individuals were Cody Barneck (age 33), Mark Barneck (age 66), Aisa Bailey (age

19), and Angel L. (age 16).[3] Cody is Mark's son; father and son lived at the same

residence. Bailey is Mark's grandson and Cody's nephew. Conner and Angel are

Bailey's friends.

The murder victim assaulted Cody and Mark with a plastic axe handle. The next

day, Mark asked Bailey for a firearm to protect against the victim. Bailey, Conner, and

---

minor's criminal sophistication" (§ 707, subd. (a)(3)(A)(ii) [degree of criminal sophistication]); "the minor's potential to grow and mature" (*id.*, subd. (a)(3)(B)(ii) [possibility of rehabilitation within the time remaining of juvenile court jurisdiction]); "the seriousness of the minor's previous delinquent history and the effect of the minor's family and community environment and childhood trauma on the minor's previous delinquent behavior" (*id.*, subd. (a)(3)(C)(ii) [previous delinquent history]); "the adequacy of the services previously provided to address the minor's needs" (*id.*, subd. (a)(3)(D)(ii) [previous juvenile court attempts to rehabilitate]); and "the actual behavior of the person, the mental state of the person, the person's degree of involvement in the crime, the level of harm actually caused by the person, and the person's mental and emotional development" (*id.*, subd. (a)(3)(E)(ii) [circumstances and gravity of the alleged offense]).

[2]     We take the facts of the alleged offense and the investigation details from the probation report. The probation report summarizes law enforcement interviews with participants in the alleged offense, which took place within days of the offense.

[3]     Because of their shared last name, we refer to Cody and Mark by their first names. No disrespect is intended.

Angel arrived at Cody and Mark's residence in the late-night hours, armed and wearing black ski masks. Bailey drove the group, which also included his girlfriend. The girlfriend remained in the car when the males got out.

Bailey gave Cody a .22-caliber rifle. The victim arrived a few minutes later. Cody fired a warning shot in the victim's direction when the victim began walking toward the group. Bailey, Conner, and Angel then fired at the victim. The victim fell to the ground, and one or more of the shooters continued to fire at him. Bailey, Conner, and Angel fled in Bailey's car immediately after the shooting. Cody and Mark walked into the desert and buried the rifle there. Cody later led investigators to the rifle. Mark later called the shooting "a revenge killing."

The victim had five gunshot wounds in his back. Investigators found five expended .380-caliber rounds near the victim's body and two expended nine-millimeter rounds in front of the residence.

Law enforcement searched Conner's residence in October 2023. Officers found a nine-millimeter firearm and a .40-caliber firearm in a backpack. They also found ammunition of various calibers. When officers interviewed Conner, he said that Bailey and a female picked him up on the day of the shooting. But Conner did not remember anything else, "because his memory was a blur." He also said that the firearms found at his residence did not belong to his family members and that he was holding them for "someone."

Law enforcement also analyzed Conner's cell phone and found numerous images of firearms, including the .22-caliber rifle that Cody used in the shooting. The phone contained a photo of a male wearing a black ski mask and a photo of the crime scene perimeter, which was dated one day after the shooting.

II.    *The wardship petitions*

In August 2022, the People filed a juvenile wardship petition alleging that Conner committed one count of felony vandalism and one count of misdemeanor vandalism. (Pen. Code, § 594.) He was caught on video throwing a rock at a car window, and the rock ricocheted off that car and broke the window of another car. He admitted the felony charge, and the court deferred entry of judgment and placed Conner on probation in October 2022. (See *In re J.G.* (2019) 6 Cal.5th 867, 869 ["Under California's deferred entry of judgment procedure, an eligible minor, after admitting the charges in a petition alleging a violation of law and successfully completing probation, may have the charges dismissed and the juvenile court records sealed"].)

The juvenile court set the vandalism matter for a review hearing on October 19, 2023. The probation officer reported that Conner's performance on probation had been "fair," and the officer recommended that the court terminate probation, dismiss the petition, and order Conner's records sealed. Conner's mother was serving a state prison sentence, and he was living with his grandfather.

The People filed a subsequent petition on the day of the review hearing, so the court continued the matter. The subsequent petition alleged that in July 2023, several days before Conner's 18th birthday, he committed a misdemeanor violation of driving under the influence of alcohol (DUI). (Veh. Code, § 23152, subd. (a).) He lost control of his car and crashed into a parked car. He had a blood alcohol level of 0.146 percent, and his blood also tested positive for cannabinoids.

Conner was arrested for Abshear's murder on October 27, 2023, and detained in juvenile hall. The People filed a second subsequent petition alleging that Conner committed murder in May 2023. (Pen. Code, § 187.) The petition also alleged that Conner personally and intentionally discharged a firearm, causing great bodily injury or death. (Pen. Code, § 12022.53, subd. (d).)

In light of the subsequent petitions, the court lifted deferred entry of judgment on the initial vandalism petition. (§ 793, subd. (a).)

III.    *The transfer motion, the psychological evaluations, and the probation report*

After the People filed the second subsequent petition alleging murder, they immediately moved to transfer Conner to criminal court under subdivision (a)(1) of section 707. Conner's counsel asked the court to appoint a psychologist to evaluate Conner under Evidence Code section 1017, and the court appointed Dr. William Jones. The probation department later asked the court for a psychological evaluation of Conner under section 741, and the court appointed Dr. Robert Suiter.

A.    *Dr. Jones's report*

Dr. Jones evaluated Conner in July 2024.  The doctor interviewed Conner and his maternal grandfather.  Conner reported that he spent most of his life in the home of his maternal grandparents, and they were his only source of stability.  His maternal grandmother was like a mother to him, and he was also close to his maternal grandfather.  Conner began abusing drugs and alcohol when his maternal grandmother died in 2018.  Both of his parents abused alcohol and drugs, and his mother was sentenced to prison for multiple DUI offenses.  His parents lived together until Conner was five or six years old.  The parents physically abused him, and he witnessed domestic violence between his parents and between his father and stepmother.  His mother moved them around frequently when they were not living in the grandparents' home.  He avoided going home because he did not like to see his mother intoxicated.

Conner had felt depressed and anxious for a long time because of his chaotic and abusive upbringing.  He had difficulty sleeping and had nightmares about twice per week.  He said that he had been shot at five times when he was 18 years old.  Since he had been in juvenile hall, three friends had been shot, and two of them were paralyzed.

Conner began using alcohol and marijuana around age 13 and used both regularly.  He began using cocaine and methamphetamine a few years later, and he believed that he was addicted to both.  He had also used LSD, PCP, ketamine, Oxycontin, Norco, and Xanax.

8

In the car accident that led to his DUI charge, Conner broke his left leg and arm, requiring surgery on both. He received therapy for several years around age 13 after the child welfare agency referred him, but he did not like talking about personal matters with a stranger.

Conner graduated from high school and was taking college-level classes at juvenile hall. He had an individual education plan in high school, indicating that he had a learning disability. He wanted to have his own welding business, and he had worked in construction and at a restaurant.

Conner's grandfather described him as quiet, cooperative, and a "'good kid'" who had many friends. Conner and his grandfather had a very good relationship, and his grandfather was surprised by the murder charge. He said that Conner was very affected by the loss of his grandmother and that Conner was traumatized by his mother's alcoholism.

Dr. Jones diagnosed Conner with posttraumatic stress disorder. Symptoms of posttraumatic stress disorder include irritability, angry outbursts with little or no provocation, impulsivity, recklessness, and self-destructive behavior. Dr. Jones opined that Conner likely experienced those symptoms.

B.    *Dr. Suiter's report*

Dr. Suiter evaluated Conner in September 2024. Dr. Suiter interviewed Conner and administered several psychological tests. The doctor also reviewed two police

9

reports regarding the alleged offense, Dr. Jones's report, Conner's academic records, and Conner's CLETS (California Law Enforcement Telecommunications System) printout.

Dr. Suiter's interview with Conner elicited much of the same information contained in Dr. Jones's report. Conner described his parents' substance abuse, his close relationship with his grandparents, his grandmother's death, and his own substance abuse.

Dr. Suiter concluded that Conner was likely open and honest during the psychological testing, but there were some indications that Conner was attempting to present himself in an unduly negative light. The doctor opined that Conner was likely experiencing symptoms of posttraumatic stress disorder. He further opined that Conner has a "fairly significant mistrust of others" and is likely to feel that others are treating him inequitably. Conner was prone to impulsivity and rapid mood swings. In addition, he might "have some mild underlying anger and hostility," but he was "not necessarily predisposed to express it verbally or physically." He also was not predisposed to use guns and violence.

Dr. Suiter concluded that Conner likely has substance abuse disorders, including alcohol, cocaine, and amphetamine-type use disorders. Conner also "may have a history of antisocial behavior and/or a manifested conduct disorder during adolescence." The doctor concluded that Conner "clearly" needed long-term substance abuse treatment and that he likely would benefit from psychotropic medication and therapy.

C.     *The probation report*

In December 2024, the probation department submitted a report recommending that the juvenile court deny the transfer motion. The probation report described Conner's personal history and included statements from Conner and his mother. The probation officer also reviewed and considered the reports of Dr. Jones and Dr. Suiter.

Conner's mother reported that his father was physically and emotionally abusive and that Conner witnessed much domestic violence between his father and his father's partners. Conner denied being the victim of any abuse. But Conner was the subject of numerous dependency referrals between 2008 and 2023. The referrals regarding both parents were substantiated in two cases, and the remaining referrals were unfounded, inconclusive, or evaluated out. The first set of substantiated referrals occurred in 2008, when Conner was two years old. The reporting party said that the parents had a history of drug and alcohol abuse, the home was filthy and lacked any food, and Conner and his siblings were "really hungry."

The second set of substantiated referrals occurred in 2019, when Conner was 13 years old. Conner's mother was found asleep on a bench at the mall. She smelled strongly of alcohol, and Conner's one-year-old brother was crying in a stroller next to her. The court removed Conner from his mother's custody and placed him with his father. Conner said that he lived with his father for one year and then returned to his mother's home, but his mother said that he lived with his father for only three months. She said that Conner was removed from his father after they got into a physical fight.

11

With respect to substance abuse, Conner reported that he started smoking marijuana at age 13 and smoked daily when he could afford it. He also used cocaine and inhalants for roughly six months when he was 17 years old. When he was 16 years old, he started using Xanax and Percocet five times per week for about two years. Conner began drinking alcohol at age 14 or 15. He started drinking when his grandmother died, and he drank three times per week.

During Conner's time in juvenile hall, he was diagnosed with posttraumatic stress disorder and attention deficit hyperactivity disorder. He received some counseling in connection with prior dependency proceedings. He attended Alcoholics Anonymous meetings with his father, but Conner was not consistent with the program. Conner's mother said that he also suffered from depression.

In November 2022, Conner denied that he was a gang member, but he said that he got along with members of the Barrio San Rafael gang. He told juvenile hall staff in October 2023 that he would "have issues" with two other gangs. When interviewed in December 2024, Conner said that he had been associating with the Barrio San Rafael gang since he was 18 years old. The probation report described Conner's numerous tattoos. He had several tattoos on his left forearm, including an "A" on one side, a "B" on the other side, and a turtle.

Conner's adjustment to juvenile hall was "[s]atisfactory." He earned his high school diploma in May 2024. He engaged in programs regularly, and staff described him as quiet, helpful, and respectful. But there were also some negative reports. In

12

November 2024, staff noted that Conner was "'very entitled'" and had questioned staff. He also instigated arguments between others. In December 2024, he asked to be segregated after two youths attacked him.

Conner hoped that the juvenile court did not transfer his matter to criminal court, and he wanted to go to college, work, stay sober, and "'make good choices.'" On the advice of counsel, he did not discuss the alleged offense or the victim. Conner's mother was confident that he was innocent. She described him as loving, docile, and calm, and she blamed Bailey for Conner's behavior. She said that Conner had "'affiliated with the wrong person.'"

If Conner were to remain under the juvenile court's jurisdiction, then he would be eligible for the local Pathways to Success program. Youths in that program are housed in a secure juvenile hall unit or a transitional dorm unit. Each youth has a multidisciplinary treatment team consisting of probation staff, educational personnel, behavioral health staff, an institutional nurse, and an approved community partner. The youth has an individualized treatment plan, and their treatment team meets weekly to review their progress. The programs and services available at Pathways to Success include individual therapy, group therapy, group classes on dialectical behavior therapy and restorative justice, aggression replacement training, gang disassociation, parenting education, substance abuse treatment, victim awareness education, job skills training, career guidance, and programs called "Thinking for a Change" and "Forward Thinking."

The probation officer opined that two of the five criteria contained in section 707, subdivision (a)(3), weighed in favor of transferring Conner to criminal court: the degree of criminal sophistication exhibited by him and the circumstances and gravity of his alleged offense. But the probation officer recommended that the juvenile court retain jurisdiction over Conner on the basis of the other three statutory criteria: whether Conner could be rehabilitated before the expiration of juvenile court jurisdiction, his delinquent history, and the success of previous attempts to rehabilitate him. Conner was 19 years old at the time, so more than five years of juvenile court jurisdiction remained. The probation officer concluded that five-plus years was sufficient time to rehabilitate Conner through Pathways to Success. The officer further concluded that his delinquent history was minimal and did not involve violence. And the officer reasoned that although Conner's term of probation for the vandalism offense had not successfully rehabilitated him, he had never received treatment in a secure setting like Pathways to Success.

D.     *The People's brief*

The People's brief in support of their transfer motion included numerous exhibits. Five of those exhibits were police reports concerning a stabbing incident at a high school in October 2021. B.S. stabbed the victim, Dallas N., in the abdomen and arm. According to the reports, Conner said that he was B.S.'s friend and that he was present during the incident. Dallas also told officers that Conner and another youth were with B.S. during the incident. Dallas said that B.S. started a fight with him, and then B.S.'s "friends" surrounded Dallas. After some mutual shoving between B.S. and Dallas, B.S.'s friends

14

tried to hold Dallas, who tried to push them away. B.S. then pulled out a knife and stabbed Dallas, and B.S.'s friends tried to block Dallas from fleeing. Law enforcement determined that B.S., Conner, and the third youth planned the attack on Dallas, and the investigators forwarded the matter to the district attorney's office for the prosecution of all three youths.

IV.    *The transfer hearing*

The court held the contested transfer hearing in May and June 2025. Three witnesses testified: an investigator in the central homicide unit of the sheriff's department, Joshua Manjarrez; an investigator in the district attorney's office, Rebecca Torres; and the probation officer who prepared the report for the transfer hearing. The court also admitted Conner's school disciplinary records, some juvenile hall incident reports, and a letter from Conner to the court.

A.    *Manjarrez's testimony*

Manjarrez was a primary investigator of the shooting in this case. Officers arrested Bailey at his residence two days after the shooting. Conner was there, and officers detained him until an adult picked him up. Conner had $700 in cash on him.

The sheriff's department searched Conner's cell phone in May 2023, shortly after the shooting. The phone contained numerous photos of firearms, several photos of Conner with firearms, and conversations indicating that he was buying and selling firearms. For instance, there were photos of Conner with other youths in which he was drinking from a beer bottle and holding a firearm. The phone also contained a photo of a

15

person in a black ski mask, and the same photo appeared on Conner's social media account. In addition, there was a photo of a .22-caliber rifle that was identical to the rifle used in the shooting.

The Instagram account on Conner's phone used his known monikers, "Dino Strapz" and "C-LOK." The friends in the photos and videos on Conner's Instagram account typically included Bailey and Angel. Conner and Bailey were "best friends" and very close. Conner's Instagram account included photos of firearms and conversations regarding buying and selling firearms and narcotics. In addition, posts on Conner's Instagram account showed photos of Bailey in a courtroom and referred to freeing him, as in, "free Aisa." One post showed Bailey in a courtroom and a female deputy in the background. The deputy was circled, and there was a caption on the image stating, "'[T]his bitch was there when we got arrested.'" Another post showed Bailey and Cody in a courtroom and referred to Cody as a "rat." Specifically, there was a caption next to Cody stating, "Fuck a," followed by two rat emojis. Cody was wearing a yellow jumpsuit. In county jail, the yellow jumpsuit signifies protective custody. It is a common perception that an inmate is in protective custody because they have "snitched" to law enforcement.

Manjarrez spoke to Bailey's girlfriend in the course of his investigation. She said that on the night of the shooting, she and Bailey picked up two of Bailey's friends before heading to the location of the shooting. Both friends wore dark or black clothing, including black ski masks, and both friends had firearms.

16

Manjarrez arrested Conner and participated in the search of Conner's residence in October 2023. Officers found a nine-millimeter firearm, a .40-caliber Smith & Wesson firearm with a tactical light on the rail, a Glock firearm, a great deal of live ammunition, expended casings, an empty package of night sights for a firearm, and firearm cleaning supplies. Some of the firearms were in a bag in his grandfather's room. According to ballistics analyses, the firearms found at Conner's residence were not used in the shooting of Abshear.

The bullets recovered from Abshear's body were from a .38-caliber firearm and did not match the .380 casings found at the scene. A .38-caliber gun is typically a revolver, which does not expel casings automatically. The shooter would have to manually extract the casings from the wheel of the gun, which is not common at crime scenes. Abshear was shot in the back. Manjarrez had not found any evidence that the victim was armed with a firearm when he was shot.

Manjarrez interviewed Conner after his arrest. Manjarrez created a fake lineup in which Conner's photo was circled. He showed it to Conner, and Conner said that it was "funny to him" that he was in a lineup with "a bunch of innocent people." Conner said that the investigator "had put him in a lineup with a bunch of preppy white boys."

The deputy district attorney asked Manjarrez to describe Conner's demeanor during the interview. Manjarrez replied: "It was my opinion, to me, that he was not being truthful. He was being a little evasive. He was trying to distance himself, very vague." Conner was also dismissive of the evidence that the investigator showed him.

17

He appeared uninterested and yawned during key portions of the interview. But Conner admitted that he was with Bailey on the day of the shooting. Conner said that he did not recall anything about the shooting, and "it was a blur." At that point, he said that he did not want to speak with Manjarrez anymore, and he asked for an attorney.

Manjarrez conducted a "Perkins operation" in which undercover agents were placed in a monitored location with Conner to gather information.[4] The operation took place on the day of Conner's arrest, and it was audio and video recorded. Manjarrez monitored the operation in real time from a remote location in the same facility. He also reviewed the recording later, and he wrote a report regarding the operation.

Conner and the undercover agents were wearing civilian attire. Conner and the agents were joking and laughing, and they seemed to be connecting. They had "good chemistry," and Conner seemed to relate to the undercover agents as peers or contemporaries. It did not appear as though Conner was under any pressure or stressed. The undercover agents did not appear to be aggressive or intimidating.

Conner told the undercover agents that he, his friend Bailey, and Bailey's family members were arrested for a homicide. He said that Bailey was upset because the victim had assaulted his grandfather. Conner described the victim as "a tweaker and a nobody." Bailey asked Conner to "go handle some shit" with Bailey. Conner replied, "Fuck yeah,

---

**4** *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*) held that an undercover officer posing as a fellow inmate need not give warnings under *Miranda v. Arizona* (1966) 384 U.S. 436 "before asking questions that may elicit an incriminating response." (*Perkins*, at p. 300.)

pick me up."  They also picked up a "youngster" named "Miclo," which was Angel's moniker.  They included Angel because he was a juvenile and "active," meaning that he was willing to commit crimes and was not afraid.  Conner left his cell phone at home so that his location could not be tracked.  Bailey's girlfriend was also present, and Conner asked Bailey why he had brought his girlfriend.  Conner told Bailey that he "knew better than to bring a girl along."

Conner stated that Bailey shot the victim when the victim approached their group; Bailey said, "'[T]his is for my grandpa, bitch ass . . . .'"  After that, "everybody" shot at the victim.  The victim fell to the ground and was "making noises."  Conner then walked up to the victim and shot him two more times.  He said that Angel used a .380-caliber firearm during the shooting.  Conner thought that Bailey's girlfriend had "snitched on them to the police."  Conner contacted her and demanded to know what she had told law enforcement.

Conner also told the undercover agents that officers were searching his home and would find "blowers," or guns, that he had hidden in his grandfather's room.  The guns were "dirty," meaning that they had been used in crimes.  In particular, a .40-caliber Smith & Wesson firearm was used in a murder.  Conner said that he had recently sold three firearms.

Conner additionally told the undercover agents that he had been involved in four other murders and had never been arrested for those crimes.[5]  He gave the undercover agents detailed information about the other murders.  Conner's statements enabled Manjarrez to identify which law enforcement agencies would be investigating those murders, so he forwarded the information to the relevant agencies.  Manjarrez thought that Conner's statements were "credible enough," because Conner's statements about the present case were credible.  Conner had disclosed nonpublic information about this case to the undercover agents, and only someone involved in the offense or the investigation would know that information.

Conner mentioned that a tattoo on his arm represented a homicide that he had committed with Bailey.  He said that he went by "C-LOK," "Dino," and "C-murder" among his friends.

B.     *Torres's testimony*

Torres had contact with Conner in connection with the 2021 stabbing of Dallas.  She investigated that stabbing, and Conner "ha[d] some play in that particular investigation," but B.S. was arrested for the stabbing.  Torres accessed Conner's public Instagram profile.  In October 2023, Conner posted a video showing a tattoo of a "B" and

---

**5**     The record is unclear regarding the number of other murders.  Manjarrez testified that Conner said that he was involved in four other murders.  According to Manjarrez's report on the *Perkins* operation, "Conner stated he had committed four other murders," and this case was his first arrest for murder.  But several paragraphs later, the same report states:  "Conner confirmed he got away with three additional murders, and this was his fourth."

a turtle on one side of a forearm.  Next to the "B," a caption stated: "[B.] I love you dawg no gay shit had to get a turtle for you an a B your like my bro, me you and asa been through it all and always been solid to each other."  That caption used B.S.'s first name. (All typographical and grammatical errors are in the original caption.)

In October 2023, Conner also posted a video of large bundles of cash, including $100, $50, and $20 bills.  The video was in an album called "Work."

Torres listened to calls that Conner made from juvenile hall.  Although Bailey also was in custody, Conner was able to speak to him.  Conner called his mother, who connected Conner to a third person, and that third person was on a call with Bailey. Conner and Bailey spoke about letters that they had written to each other.  Bailey did not receive one particular letter.  They believed that was because Conner had put "gang writing" or tagging in the letter, so Conner said that he would erase the tagging and resend the letter.

C.    *The probation officer's testimony*

According to the probation officer, the Pathways to Success program took four to seven years to complete.  Conner's amenability to rehabilitation in the juvenile court would depend largely on whether he embraced the programming available in Pathways to Success.  That would include disassociating from gang members or criminal associates. He had not previously received comprehensive rehabilitative programming.  The deferred entry of judgment with respect to the vandalism petition was "minimal intervention."

21

The probation officer was not aware of the *Perkins* operation in this case, so she did not consider it in preparing her report.

D.     *School disciplinary records and juvenile hall incident reports*

Conner's school disciplinary records showed that in 2020, when he was 14, he was suspended for three days after he was found with a THC vape pen and a nicotine vape pen. He said that the THC pen was for his own use and that he planned to sell the nicotine pen. In 2018, he received detention for twice saying "the f-bomb" to a security guard. That same year, he was cited for harassment or bullying on the basis of race, classroom disruption, and disrespectful comments to a substitute teacher. He was also suspended for two days for engaging in mutual combat with another student.

According to an April 2024 juvenile hall incident report, staff found contraband in Conner's room, including a SIM card for an MP3 player and a photo of a youth displaying apparent gang hand signs. In December 2024, another youth attacked Conner.

E.     *Conner's letter to the court*

In Conner's letter to the court, he stated that he was drug free and intended to stay sober when he got out of custody. He wanted a "fresh start at life," to attend college, and to find a good job. He missed his family and wanted to be there for his niece, his younger brothers, and his grandfather, whose health was failing. He was certain that he would not be "hanging out with the same people" anymore. He planned to attend church every week and look for Alcoholics Anonymous meetings. Conner felt that being in juvenile hall had changed him for the better. He had not fought since his detention, even

22

though peers had attacked him. He learned that violence would not solve anything. Conner hoped to be released soon.

V.     *The juvenile court's ruling*

The court issued a 36-page tentative ruling granting the People's transfer motion. At a hearing in July 2025, the court adopted the tentative ruling as its final ruling. The court found by clear and convincing evidence that Conner was not amenable to rehabilitation while under the jurisdiction of the juvenile court.

With respect to the first criterion—the degree of criminal sophistication exhibited by Conner (§ 707, subd. (a)(3)(A)(i))—the court found Conner "to be highly criminally sophisticated for a minor." The court concluded that the facts of the alleged murder showed "a great deal of preplanning and sophistication." In addition, Conner's actions after the alleged offense demonstrated criminal sophistication. For instance, he contacted Bailey's girlfriend and demanded to know what she told law enforcement, and he placed Cody and a deputy in danger by posting negative social media content about them.

Moreover, evidence unrelated to the alleged murder showed Conner's criminal sophistication. He possessed multiple firearms and ammunition, he had been buying and selling firearms and narcotics, he was posing with firearms in photos, and he had been associating with gang members before and after the alleged offense. Conner also told the undercover agents that the firearms at his residence had been used in crimes, and he said that he had been involved in four other murders but had never been arrested for one until now. The court observed that Conner had provided detailed information about the other

23

murders and that Manjarrez believed that information was credible, and the investigator had forwarded the information to the relevant law enforcement agencies. (The court noted that the People had not introduced the recording of the *Perkins* operation, but they offered Manjarrez's testimony and report about the operation.) The court weighed the reports of Dr. Suiter and Dr. Jones, Conner's dependency history, and the evidence of his chaotic and traumatic upbringing. But "without minimizing [Conner's] trauma," the court found that all of that evidence did not "reduce [Conner's] criminal sophistication." The court thus concluded that the criterion supported transfer to criminal court.

Regarding the second criterion—whether Conner could be rehabilitated before juvenile court jurisdiction expires (§ 707, subd. (a)(3)(B)(i))—the court concluded that the People had not carried their burden of proof. The court reasoned that there was conflicting evidence about Conner's potential to grow and mature, and the People had not proven that there was insufficient time to rehabilitate Conner. The criterion therefore did not support transfer to criminal court.

As to third criterion—previous delinquent history (§ 707, subd. (a)(3)(C)(i))—the court found that Conner's delinquent history was serious and escalating. The court discussed his two other wardship petitions for the vandalism and DUI offenses, as well as his school records showing that he was disciplined for various offenses. In addition, there was evidence that he had been involved in the stabbing in 2021 and that he was buying and selling firearms. Further, he told the undercover agents that the firearms found at his residence had been used in crimes, and he said that he had been involved in

24

four murders. The court noted that it had "fully considered" the evidence of Conner's family and community environment and his childhood trauma. It also noted that the probation officer did not have all of the information available to the court when she determined that this criterion did not support transfer. The court concluded that the People had carried their burden of proof with respect to the criterion, and the criterion supported transferring Conner to criminal court.

Regarding the fourth criterion—the success of previous attempts by the juvenile court to rehabilitate Conner (§ 707, subd. (a)(3)(D)(i))—the court observed that there had been only a limited attempt at probation intervention. But Conner had never received treatment in a secure setting where individualized programming and counseling would be available. The court concluded that the criterion did not support transfer to criminal court.

Lastly, with respect to the fifth criterion—the circumstances and gravity of the alleged offense (§ 707, subd. (a)(3)(E)(i))—the court found that Conner's conduct in the shooting was "cruel and callous," he "clearly understood the wrongfulness of his actions," and he was thinking clearly enough to take steps to avoid detection. The court weighed the evidence regarding Conner's childhood and trauma but concluded that "on balance," the evidence did not mitigate the gravity of the offense. The court therefore determined that the criterion favored transfer to criminal court.

DISCUSSION

I.     *Substantial evidence supporting the transfer order*

Conner argues that the juvenile court abused its discretion by granting the transfer motion, because the record does not contain substantial evidence to support the finding that he was not amenable to rehabilitation while under the juvenile court's jurisdiction. He contends that the evidence is insufficient because the court relied on unreliable evidence, namely, the evidence regarding (1) the 2021 stabbing incident and (2) Conner's statement to the undercover agents that he was involved in four murders. The argument lacks merit.

"We review the juvenile court's ruling on a transfer motion for abuse of discretion." (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 165.) "'The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.'" (*Ibid.*) "The juvenile court's findings with respect to each of section 707's five criteria are findings of fact reviewed for substantial evidence." (*Ibid.*)

"Likewise, we review for substantial evidence the juvenile court's ultimate finding 'that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.' [Citation.] Because the juvenile court must make that finding by clear and convincing evidence, we 'determine whether the record, viewed as a whole, contains

26

substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by' the clear and convincing evidence standard." (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 165, quoting *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.) "In conducting substantial evidence review, we draw all reasonable inferences in support of the court's findings." (*Miguel R.*, at p. 165.) "We do not reweigh the evidence." (*In re J.S.* (2024) 105 Cal.App.5th 205, 211.)

Conner argues that there was "little to no evidence" that he was involved in the 2021 stabbing incident. He asserts that the People did not file any charges against him for that incident, so the police reports regarding the incident were not reliable. In a similar vein, Conner argues that there was no "value" in the evidence that he told the undercover agents about his involvement in four murders. He contends that the evidence was unreliable, because the court did not review the recording of the undercover operation and therefore could not independently assess his credibility, and there was no evidence corroborating his involvement in other murders.

By challenging the extent to which the court relied on the evidence, Conner challenges the weight that the court gave the evidence. The argument fails, because we do not reweigh evidence on appeal.

Moreover, whatever weight the court gave the challenged evidence, Conner fails to show that the court's findings were not supported by substantial evidence. The court relied on the evidence of the stabbing when it concluded that Conner's delinquent history weighed in favor of transfer to criminal court. And the court relied on the evidence

regarding his involvement in other murders when it concluded that his criminal sophistication and delinquent history weighed in favor of transfer. Conner addresses the challenged evidence in isolation but does not discuss the ample additional evidence supporting the court's findings with respect to those two criteria.

The evidence of Conner's criminal sophistication is substantial. The record shows that the victim assaulted Bailey's family members the day before the shooting. Conner enthusiastically responded to Bailey's request that he help "handle" a situation, saying "Fuck yeah, pick me up." When Bailey picked him up, Conner had taken steps to avoid detection and conceal his identity—he was wearing dark clothing and a black ski mask, and he left his cell phone at home so that his location could not be tracked through it. He was also armed with a firearm. Conner questioned Bailey's decision to involve his girlfriend, and Conner told Bailey that he knew better than to bring her. Conner and Bailey recruited Angel because they knew that he was unafraid to commit crimes. After Abshear had been shot but was still making noise, Conner shot the victim two more times as he lay on the ground. The court could reasonably infer that Conner participated significantly in a planned killing that was retaliation for a prior assault on Bailey's family members.

Conner also took steps after the shooting that showed an intent to intimidate witnesses or help Bailey and himself avoid prosecution. He talked to Bailey's girlfriend after she had spoken with law enforcement, and he demanded to know what she had told the officers. He posted a photo on his public Instagram profile of Cody, calling Cody a

rat and thus suggesting that Cody was cooperating with law enforcement. Additionally, he posted a photo of a deputy, called her a "'bitch,'" and identified her as one of the officers who arrested or detained him and Bailey.

The record shows that Conner was criminally sophisticated in other ways. Officers found several firearms and a great deal of ammunition at his home. He had hidden guns in his grandfather's room, and he told the undercover agents that the guns had been used in other crimes. His cell phone and social media contained numerous photos of firearms, and conversations on his phone indicated that he was buying and selling firearms and narcotics. That would explain the $700 in cash on his person when officers detained him shortly after the shooting, and it would explain the large bundles of cash on his Instagram profile. (His construction and restaurant jobs were less likely explanations.) There is evidence that he was selling contraband as early as age 14, when he told school staff that he intended to sell a nicotine vape pen. He also told the undercover agents that he had recently sold three firearms. In addition, although there was no evidence that Conner was a gang member, he admitted that he had been associating with a gang since the age of 18. Even before that, when he was 17, he said that he got along with members of the same gang. He went by several monikers, including C-murder. Juvenile hall staff found a photo of a person displaying gang signs in his room. Conner figured out that Bailey had not received one of his letters because Conner had put gang tagging on it, so he resolved to erase that and resend the letter. Finally, Conner told the undercover agents that he had been involved in several other

29

murders but had not been arrested for those. All of the foregoing evidence constitutes substantial evidence that Conner's criminal sophistication supported transfer. Conner's statement that he was involved in other murders is merely one piece of evidence supporting the court's finding.

Likewise, the record contains ample evidence that Conner's delinquent history supported transfer to criminal court. Under that criterion, the court may consider any delinquent conduct that took place before the transfer order. (*D.C. v. Superior Court* (2021) 71 Cal.App.5th 441, 451-455.) That includes uncharged conduct, such as conduct documented in a youth's school records that does not result in a wardship petition. (*Ibid.*)

Conner's school records show that from 2018 to 2020, he received discipline for disrespecting a substitute teacher, disrupting the classroom, using offensive language with a security guard, harassment or bullying on the basis of race, mutual combat, and possessing vape pens. He was suspended for the mutual combat and vape pen incidents. His delinquent conduct escalated after that. He was on probation for the felony vandalism offense when he committed the alleged murder (in May 2023) and the DUI offense (in July 2023). Although the DUI offense was a misdemeanor, it was relatively serious. Conner's blood test showed that he was under the influence of both alcohol and marijuana. He crashed his car into a parked car and sustained significant injuries that required surgery, and the offense carried the potential for serious injuries to other drivers or pedestrians. With respect to the vandalism offense, he threw a rock at a car window. There is also the evidence that he was buying and selling firearms and narcotics.

And although Conner was not the perpetrator of the stabbing incident, the victim reported that Conner was with the perpetrator, B.S., and B.S.'s friends surrounded the victim and tried to block his escape. Conner has a forearm tattoo dedicated to someone with B.S.'s first name, whom he professed to love like a brother. The court could reasonably infer that Conner was willing to help B.S. commit a stabbing, just as he was willing to help his close friend Bailey commit the shooting. Finally, there is the evidence that Conner was involved in several other murders for which he had not been arrested. On this record, the court's finding that Conner's delinquent history weighed in favor of transfer is supported by substantial evidence, and not merely the evidence that Conner challenges.

In sum, the record contains substantial evidence supporting the court's findings. Conner challenges the weight that the court gave certain evidence, but we do not reweigh the evidence on appeal.

II.     *Testimony regarding Conner's credibility*

Manjarrez testified that Conner's statements about his involvement in other murders were "credible enough" for Manjarrez to forward the information to the relevant law enforcement agencies. Conner argues that the court prejudicially erred by admitting improper opinion testimony regarding the credibility of the statements. We conclude that any error was harmless.

"Lay opinion about the veracity of particular statements by another is inadmissible on that issue." (*People v. Melton* (1988) 44 Cal.3d 713, 744 (*Melton*).) "With limited

31

exceptions, the fact finder, not the witnesses, must draw the ultimate inferences from the evidence." (*Ibid.*)

As a preliminary matter, the People argue that Conner forfeited the argument, because he did not object to the credibility testimony at the transfer hearing. Conner points out that he objected to other credibility testimony—he objected to Manjarrez's testimony that Conner was not being truthful during his interview with Manjarrez. The court overruled that objection, so Conner argues that any further objection would have been futile. In the alternative, Conner argues that counsel rendered ineffective assistance by failing to object.

We assume for the sake of argument that Conner has not forfeited his challenge and that the challenged testimony constituted improper opinion testimony. Regardless, any error did not prejudice him.

It is not reasonably probable that Conner would have obtained a more favorable result absent the credibility testimony. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) That is because the record contains extensive independent evidence that Conner's statements about the other murders were credible. Manjarrez testified that Conner provided detailed information about the other murders. "[T]estimony about the details, or lack thereof, in [Conner's] information was entirely proper, since these were facts bearing on its credibility." (*Melton*, *supra*, 44 Cal.3d at p. 745.) Moreover, other evidence corroborated much of the information that Conner disclosed to the undercover agents about this case, and Manjarrez testified that Conner disclosed nonpublic information. For

32

instance, Conner told the agents that Bailey recruited him for the shooting after the victim assaulted Bailey's grandfather. He told them that Bailey's girlfriend was present. He told them that another shooter, Angel, used a .380-caliber firearm. He told them that he had recently sold three firearms, and he had hidden firearms in his grandfather's room. Law enforcement interviews with the other participants in the shooting showed that the shooting was retaliation for the victim's assault on Bailey's family and that Bailey brought his girlfriend to the crime scene. The crime scene investigation revealed that one of the shooters used a .380-caliber firearm. Officers found firearms in a bag in Conner's grandfather's room when they searched the home, and the search of his cell phone revealed conversations about buying and selling firearms.

The court could reasonably conclude from the corroborating evidence that Conner was being truthful with the undercover agents about this case. If he was being truthful about his involvement in this case, then the court could reasonably infer that he was being truthful about the other murders. And the deputy district attorney could have asked the court to draw those reasonable inferences in closing argument, even without Manjarrez's opinion that Conner's statements were credible. Given the extensive independent evidence that the statements were credible, it is not reasonably probable that the court would have evaluated Conner's credibility differently in the absence of Manjarrez's credibility opinion.

Moreover, even if the court would have given less weight to Conner's statements about the other murders in the absence of Manjarrez's credibility opinion, it is not

33

reasonably probable that the court would have denied the transfer motion. As explained in part I of the Discussion, *ante*, the evidence supporting transfer to criminal court was ample. The court did not rely only on Conner's statement that he was involved in other murders. Rather, it relied on plenty of other evidence showing that Conner's high degree of criminal sophistication, the circumstances and gravity of the alleged offense, and Conner's delinquent history weighed in favor of transfer. Given all of the other evidence supporting the court's ruling, there is no reasonable probability that the court would have denied the transfer motion if it had given less weight to Conner's statements about the other murders.

For all of the foregoing reasons, we conclude that the court did not prejudicially err by admitting Manjarrez's opinion regarding Conner's credibility.

III.    *The corpus delicti rule*

Conner argues that the court violated the corpus delicti rule by relying on his statements that he was involved in other murders. The argument lacks merit.

"In every criminal trial, the prosecution must prove the corpus delicti, or the body of the crime itself—i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause. In California, it has traditionally been held, the prosecution cannot satisfy this burden by relying exclusively upon the extrajudicial statements, confessions, or admissions of the defendant." (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168-1169, italics omitted.) The corpus delicti rule thus "requires corroboration of the defendant's extrajudicial utterances insofar as they indicate a crime was committed, and forces the

34

People to supply, as part of their burden of proof in every criminal prosecution, some evidence of the corpus delicti aside from, or in addition to, such statements." (*Id.* at p. 1178, italics omitted.)

However, the corpus delicti rule does not apply to evidence of uncharged acts in criminal trials, except in the penalty phase of capital trials. (*People v. Davis* (2008) 168 Cal.App.4th 617, 634, 638; see *People v. Martinez* (1996) 51 Cal.App.4th 537, 545 ["the corpus delicti rule has never been applied to other-crimes evidence introduced for impeachment purposes in the guilt phase of a trial"]; cf. *People v. Monette* (1994) 25 Cal.App.4th 1572, 1575 [the corpus delicti rule does not apply to proof of alleged probation violations, because "the probation revocation hearing differs so substantially from a criminal prosecution"].)

Conner argues that the court erred by relying on his statements to the undercover agents that he was involved in other murders, because there was no evidence corroborating his involvement in other murders. But even if the transfer hearing were a criminal trial, the rule requiring independent corroboration does not apply to evidence of uncharged acts. The argument therefore fails.[6]

---

[6] Conner argues that the transfer hearing was rendered fundamentally unfair by the cumulative effect of all the claimed errors. The argument fails because there are not multiple "errors to cumulate." (*People v. Gonzalez* (2021) 12 Cal.5th 367, 417.) We have assumed only one claimed error, and Conner has not shown any other errors.

DISPOSITION

The order transferring Conner to criminal court is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ_____

J.

We concur:

RAMIREZ_____

P. J.

FIELDS_____

J.